## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PRISON LEGAL NEWS, a Project of
the Human Rights Defense Center,

       Plaintiff,

v.

LIVINGSTON COUNTY SHERIFF BOB
BEZOTTE, individually and officially,
and LIVINGSTON COUNTY,

       Defendants.

Case No. 2:11-cv-13460-DPH-MAR

Honorable Denise Page Hood

---

LAW OFFICES OF THOMAS M. LOEB
By:    THOMAS M. LOEB (P25913)
32000 Northwestern Highway, Suite 170
Farmington Hills, Michigan 48334
Ph: (248) 851-2020
Fax: (248) 851-2525
E-Mail: tmloeb1@mich.com
*Counsel for Plaintiff*

HUMAN RIGHTS DEFENSE CENTER
By:    LANCE WEBER
P.O. Box 2420
Brattleboro, Vermont 05303
Ph: (802) 257-1342
Fax: (866) 735-7136
E-mail: lweber@humanrightsdefensecenter.org
*Co-Counsel for Plaintiff*

THE LAW OFFICE OF BRIAN J. PRAIN, P.L.L.C.
By:    BRIAN J. PRAIN (P73944)
28475 Greenfield Road, Suite 121
Southfield, Michigan 48076
Ph: (248) 763-0641
E-Mail: brian@prainlaw.com
*Co-Counsel for Plaintiff*

CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.
By:    T. JOSEPH SEWARD (P35095)
        LINDSEY A. KACZMAREK (P74579)
33900 Schoolcraft Road
Livonia, Michigan 48150
Ph: (734) 261-2400
Fax: (734) 261-4510
E-Mail: tjseward@cmda-law.com
*Counsel for Defendants*

---

## DEFENDANTS LIVINGSTON COUNTY AND LIVINGSTON COUNTY SHERIFF BOB BEZOTTE'S BRIEF IN OPPOSITION TO PRISON LEGAL NEWS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LAW AND COUNTER-ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    PLN LACKS STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    PLN Lacks Standing to Maintain its First Amendment Claims Regarding the
            Alleged Censorship of Sample Copies and Current Issues of *Prison Legal
            News*, Copies of the Softback Book *Protecting Your Health & Safety*, and
            Informational Brochures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    PLN Lacks Standing to Maintain its Fourteenth Amendment Claim that
            Defendants Failed to Provide Notice and an Opportunity to Challenge the
            Alleged Censorship of its Unsolicited Materials . . . . . . . . . . . . . . . . . . . 4

      C.    PLN Lacks Standing to Pursue its First Amendment Claim of Interference
            with "Legal Mail" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      D.    PLN Lacks Standing to Challenge Defendants' Alleged Refusal to Allow
            PLN's Attorneys to Interview Inmates in Defendants' Custody . . . . . . . . 7

II.   PLN HAS FAILED TO CARRY ITS HEAVY BURDEN OF ESTABLISHING ENTITLEMENT
      TO THE EXTRAORDINARY RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    PLN is Unlikely to Prevail on the Merits . . . . . . . . . . . . . . . . . . . . . . . . 14

            1.    *PLN's Asserted Rights are Not Constitutionally Protected* . . . . . . 14

            2.    *PLN's Asserted Rights, if Constitutionally Protected, Cannot
                  Withstand the* Turner *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                  i.    Defendants' Content-Neutral Policies are Rationally Related
                        to Legitimate Government Interests . . . . . . . . . . . . . . . . . 19

ii.     **Alternative Means of Exercising the Asserted Rights Remain Open** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii.    **Accommodation of PLN's Asserted Rights Would Have a Substantial Impact on Defendants' Resources and Ability to Maintain Institutional Order** . . . . . . . . . . . . . . . . . . . . . . 27

iv.     **There are No Obvious, Easy Alternatives** . . . . . . . . . . . . 30

B.   **Insofar as PLN is Unlikely to Prevail on the Merits, the Remaining Factors of the Preliminary Injunction Standard Weigh in Defendants' Favor** . . . . 32

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## INDEX OF AUTHORITIES

**I.**     **United States Supreme Court Cases**

*Adderley v. Florida*, 385 U.S. 39 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436 (2011) . . . . . . . . . . . . . . . . . . . . 9

*Beard v. Banks*, 548 U.S. 521 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bell v. Wolfish*, 441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Connick v. Myers*, 461 U.S. 138 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985) . . . . . . . . . . . . . . . . . 7, 8

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167 (2000) . . . . . . . . . 1

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*In re Primus*, 436 U.S. 412 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977) . . . . . . . . . . . . . . . . . . 20, 26

*Laird v. Tatum*, 408 U.S. 1 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lewis v. Casey*, 518 U.S. 343 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*NAACP v. Button*, 371 U.S. 415 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

*Overton v. Bazzetta*, 539 U.S. 126 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26, 28

*Pell v. Procunier*, 417 U.S. 817 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20

*Saxbe v. Wash. Post. Co.*, 417 U.S. 843 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Shaw v. Murphy*, 532 U.S. 223 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 28, 29

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Turner v. Safley*, 482 U.S. 78 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Hays,* 515 U.S. 737 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*U.S. Dep't of Labor v. Triplett,* 494 U.S. 715 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## II.     <u>United States Court of Appeals Cases</u>

*Bonnell v. Lorenzo,* 241 F.3d 800 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brooks v. Seiter,* 779 F.2d 1177 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Brown v. Johnson,* 743 F.2d 408 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Glover v. Johnson,* 855 F.2d 277, 287 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Goff v. Harper,* 60 F.3d 518 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620 (6th Cir. 2000) . . . . . . . . . . . . . . 14, 33

*Guajardo-Palma v. Martinson,* 622 F.3d 801 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 6

*Haitian Refugee Ctr., Inc. v. Baker,* 953 F.2d 1498 (11th Cir. 1992) . . . . . . . . . . . . . . . 11, 12

*Haskell v. Wash. Twp.,* 864 F.2d 1266 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Columbia/HCA Healthcare Corp. Billing Practices Litig.,* 293 F.3d 289 (6th Cir. 2002) . . . . 7

*Jean v. Nelson,* 711 F.2d 1455 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jones v. Campbell,* 2001 U.S. App. LEXIS 24541 (6th Cir. Nov. 9, 2001) . . . . . . . 21, 22, 23, 24

*Kendrick v. Bland,* 740 F.2d 432 (6th Cir. l984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Leary v. Daeschner,* 228 F.3d 729 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Luby v. Teamsters Health, Welfare, & Pension Trust Funds,* 944 F.2d 1176 (3d Cir. 1991) . . 2, 3

*Mann v. Adams,* 846 F.2d 589 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mezibov v. Allen,* 411 F.3d 712 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*New Phoenix Sunrise Corp. v. Comm'r,* 2010 U.S. App. LEXIS 23909 (6th Cir. Nov. 18, 2010) . . . 7

*Rock & Roll Hall of Fame & Museum v. Gentile Productions,* 134 F.3d 749 (6th Cir. 1998) . . . . 14

*Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sheets v. Moore*, 97 F.3d 164 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 22, 24

*Spies v. Voinovich*, 173 F.3d 398 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21, 31

*Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Thompson v. Campbell*, 2003 U.S. App. LEXIS 23845 (6th Cir. Nov. 20, 2003) . . . . . . . . . . 4, 15

*Ukranian-American Bar Association, Inc. v. Baker*, 893 F.2d 1374 (D.C. Cir. 1990) . . . . . . . . . 12

*United States v. Bridwell's Grocery & Video*, 195 F.3d 819 (6th Cir. 1999) . . . . . . . . . . . . . . . . 1

*United States v. Martin*, 278 F.3d 988 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Ward v. Washtenaw County Sheriff's Dep't*, 881 F.2d 325 (6th Cir. 1989) . . . . . . . . . . . . . . . 15

## III.    United States District Court Cases

*Anderson v. Prisoner Health Servs.*, 2011 U.S. Dist. LEXIS 57663 (E.D. Mich. 2011)   . . . . 14, 33

*Barden Detroit Casino L.L.C. v. City of Detroit*, 59 F. Supp. 2d 641 (E.D. Mich. 1999) . . . . . . . . 14

*Brown v. Gerth*, 2007 U.S. Dist. LEXIS 97875 (W.D. Mich. June 6, 2007) . . . . . . . . . . . . . . . 21

*Chrysler Group LLC v. Moda Group LLC*, 796 F. Supp. 2d 866 (E.D. Mich. 2011) . . . . . . . . . . 13

*Conn v. Bd. of Educ.*, 586 F. Supp. 2d 852 (E.D. Mich. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 1

*Covell v. Arpaio*, 662 F. Supp. 2d 1146 (D. Ariz. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Fisher v. Caruso*, 2007 U.S. Dist. LEXIS 11515 (E.D. Mich. Feb. 20, 2007) . . . . . . . . . . . . . . 33

*Gambuzza v. Parmenter*, 2010 U.S. Dist. LEXIS 60444 (M.D. Fla. May 28, 2010) . . . . . . . . . . 19

*Kalasho v. Kapture*, 868 F. Supp. 882 (E.D. Mich. 1994) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kaufman v. Karlen*, 2007 U.S. Dist. LEXIS 45568 (W.D. Wis. June 21, 2007) . . . . . . . . . *passim*

*Marr v. Jones*, 2010 U.S. Dist. LEXIS 49422 (W.D. Mich. May 19, 2010) . . . . . . . . . . . . . . . . 6

*Mitchell v. Mich. Dep't of Corr.*, 2006 U.S. Dist. LEXIS 99599 (E.D. Mich. March 31, 2006) . . . . 13

*Prison Legal News v. Cheshire*, 2006 U.S. Dist. LEXIS 48099 (D. Utah June 30, 2006) . . . . *passim*

*Prison Legal News v. Livingston*, 2011 U.S. Dist. LEXIS 385 (S.D. Tex. Jan. 4, 2011) . . . . . . . . . . 3

*United States v. Johnson*, 378 F. Supp. 2d 1041 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . 7

## IV.   <u>State Court Cases</u>

*Ligons v. Perez*, 2009 Minn. App. Unpub. LEXIS 1306 (Minn. Ct. App. Dec. 15, 2009) . . . . *passim*

## V.   <u>Federal Rules of Civil Procedure</u>

Fed. R. Civ. P. 65(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## <u>QUESTION PRESENTED</u>

I.      **WHETHER PRISON LEGAL NEWS LACKS STANDING?**

        Plaintiff answers, "No."

        Defendants answer, "Yes."

II.     **WHETHER PRISON LEGAL NEWS HAS CARRIED ITS HEAVY BURDEN OF ESTABLISHING ENTITLEMENT TO THE EXTRAORDINARY REMEDY OF A PRELIMINARY INJUNCTION?**

        Plaintiff answers, "Yes."

        Defendants answer, "No."

## INDEX OF EXHIBITS

**Exhibit 1**    Complaint

**Exhibit 2**    Motion for Preliminary Injunction

**Exhibit 3**    *Prison Legal News v. Livingston*, 2011 U.S. Dist. LEXIS 385 (S.D. Tex. Jan. 4, 2011)

**Exhibit 4**    *Thompson v. Campbell*, 2003 U.S. App. LEXIS 23845 (6th Cir. Nov. 20, 2003)

**Exhibit 5**    *Prison Legal News v. Cheshire*, 2006 U.S. Dist. LEXIS 48099 (D. Utah June 30, 2006)

**Exhibit 6**    Declaration of Lance Weber

**Exhibit 7**    *Marr v. Jones*, 2010 U.S. Dist. LEXIS 49422 (W.D. Mich. May 19, 2010)

**Exhibit 8**    *New Phoenix Sunrise Corp. v. Comm'r*, 2010 U.S. App. LEXIS 23909 (6th Cir. Nov. 18, 2010)

**Exhibit 9**    Statement of Robert J. McRoberts

**Exhibit 10**   Declaration of Brian Prain

**Exhibit 11**   *Mitchell v. Mich. Dep't of Corr.*, 2006 U.S. Dist. LEXIS 99599 (E.D. Mich. March 31, 2006)

**Exhibit 12**   *Anderson v. Prisoner Health Servs.*, 2011 U.S. Dist. LEXIS 57663 (E.D. Mich. May 31, 2011)

**Exhibit 13**   Declaration of Paul Shaposka, Jr.

**Exhibit 14**   Declaration of Paul Wright

**Exhibit 15**   Policy 5(d)1

**Exhibit 16**   Policy 5(e)1

**Exhibit 17**   *Gambuzza v. Parmenter*, 2010 U.S. Dist. LEXIS 60444 (M.D. Fla. May 28, 2010)

**Exhibit 18**   Affidavit of Lieutenant Cremonte

**Exhibit 19**   *Brown v. Gerth*, 2007 U.S. Dist. LEXIS 97875 (W.D. Mich. June 6, 2007)

**Exhibit 20**   *Ligons v. Perez*, 2009 Minn. App. Unpub. LEXIS 1306 (Minn. Ct. App. Dec. 15, 2009)

**Exhibit 21**  *Kaufman v. Karlen*, 2007 U.S. Dist. LEXIS 45568 (W.D. Wis. June 21, 2007)

**Exhibit 22**  *Fisher v. Caruso*, 2007 U.S. Dist. LEXIS 11515 (E.D. Mich. Feb. 20, 2007)

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiff Prison Legal News ("PLN")

moves for a preliminary injunction mandating Livingston County and Livingston County

Sheriff Bob Bezotte (collectively "Defendants") to deliver PLN's publications and literature, to

provide notice and an opportunity to appeal any decision to censor PLN's materials, and to

allow PLN's attorneys to visit inmates in Defendants' custody.

## STANDARD OF REVIEW

The issuance of preliminary injunctive relief is committed to the discretion of the

district court. *Conn v. Bd. of Educ.*, 586 F. Supp. 2d 852, 858 (E.D. Mich. 2008).

## LAW AND COUNTER-ARGUMENT

### I.   PLN LACKS STANDING.

"Standing is a threshold inquiry; it requires focus on the party seeking to have his

complaint heard in a federal court, *and it eschews evaluation of the merits. The court is not to

consider the weight or significance of the alleged injury, only whether it exists.*" *Haskell v. Wash.

Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (emphasis in original).  This threshold issue is a

question of law. *United States v. Bridwell's Grocery & Video*, 195 F.3d 819, 821 (6th Cir. 1999).

To satisfy the "irreducible minimum" requirements for Article III standing, PLN must

demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized

and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable

to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw

Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

PLN alleges that Defendants violated its First and Fourteenth Amendment rights by

censoring sample copies of *Prison Legal News*, current issues of *Prison Legal News*, copies of the softback book *Protecting Your Health & Safety*, informational brochures, and "legal mail," and by refusing to provide notice and an opportunity to challenge these alleged censorship decisions. (Complaint, ¶¶18, 19, 22, 24, attached as **Exhibit 1**).   PLN also claims that Defendants infringed upon its First Amendment rights by refusing to allow PLN's attorneys to interview inmates incarcerated at the Jail. (**Exhibit 1**, ¶ 23). PLN lacks standing to maintain these claims, vitiating the need to determine whether it is entitled to the relief sought.

      **A.**    **PLN Lacks Standing to Maintain its First Amendment Claims Regarding the Alleged Censorship of Sample Copies and Current Issues of *Prison Legal News*, Copies of the Softback Book *Protecting Your Health & Safety*, and Informational Brochures.**

Noticeably absent from PLN's Motion for Preliminary Injunction is evidence that inmates subscribed to *Prison Legal News*, ordered *Protecting Your Health & Safety*, or requested informational brochures.  Further, PLN's postulation that "the inmates at the Jail with whom PLN has been attempting to communicate <u>will express their desire to hear PLN's speech when asked</u>" is telling of the fact that all of PLN's materials were unsolicited. (Motion for Preliminary Injunction, Docket # 25, p. 12, attached as **Exhibit 2**) (emphasis supplied).

The Supreme Court has recognized that "publishers who wish to communicate with those who, ***through subscription***, ***willingly seek their point of view*** have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (emphasis supplied).  The Supreme Court has never extended this precept, nor has it created a First Amendment interest, ***let alone a freestanding right***, to unsolicited communication with inmates.

In diametric opposition to the "truism that language in the Supreme Court's opinions should not readily be assumed to be superfluous," *Luby v. Teamsters Health, Welfare, & Pension*

-2-

*Trust Funds*, 944 F.2d 1176, 1183 (3d Cir. 1991), PLN turns a blind eye to the very language — "through subscription" — that is fatal to its claims and interprets *Thornburgh* as standing for the expansive proposition that "publishers have a legitimate First Amendment interest in access to prisoners." **(Exhibit 2, p. 5)**. PLN takes the position, as it did in *Prison Legal News v. Livingston*, that "its right to send individually addressed [materials] to certain inmates, even absent a subscription, is protected under the First Amendment and distinguishable from prohibitions on 'bulk mailings.'" 2011 U.S. Dist. LEXIS 385, *22-23 (S.D. Tex. Jan. 4, 2011) (attached as **Exhibit 3**).

The district court in *Livingston* rejected this argument and held that PLN does not have a "freestanding right to send unsolicited [materials] to prisoners. . . ." *Id.* at *23. The court found that in the absence of authority to the contrary, it "must rely upon the Supreme Court's statement in *Thornburgh* that 'publishers who wish to communicate with those who, **through subscription, willingly seek their point of view** have a legitimate First Amendment interest in access to prisoners.'" *Id.* at *24-25 (quoting *Thornburgh*, 490 U.S. at 408) (emphasis in original). Finding no basis to extend *Thornburgh*, the court held that unsolicited materials were not protected under the First Amendment and that PLN lacked standing to maintain any such claims. *Id.* at *25, 27.

The *Livingston* court reached the correct conclusion. An unsolicited publication "more nearly resembles" a mass mailing than personal correspondence, *Brooks v. Seiter*, 779 F.2d 1177, 1180-81 (6th Cir. 1985), and, "unlike personal correspondence or a personal subscription, does not represent the exercise of volition by the recipient. . . ." *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir. 1996) (citing *Brooks*).

Since PLN does not have "a freestanding right" to unsolicited communication with

inmates, it has established "no *relevant* injury in fact, i.e., injury-in-fact *caused by the violation of legal right.*" *Lewis v. Casey*, 518 U.S. 343, 353 n. 3 (1996) (emphasis in original). PLN's contention that censorship of unsolicited materials and literature unconstitutionally chills future speech (**Exhibit 2, p. 3**) is "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 14 (1972).

B.    **PLN Lacks Standing to Maintain its Fourteenth Amendment Claim that Defendants Failed to Provide Notice and an Opportunity to Challenge the Alleged Censorship of its Unsolicited Materials.**

Because PLN cannot establish injury-in-fact with regard to the alleged censorship of its unsolicited materials, it also cannot establish injury-in-fact as to its claim that Defendants failed to provide notice and an opportunity to appeal the alleged censorship of PLN's unsolicited materials. See *Kalasho v. Kapture*, 868 F. Supp. 882, 890 (E.D. Mich. 1994) (because the inmate did not have a constitutionally protected right to receive catalogs, he could not "assert a claim that he has been deprived of a protected interest without due process of law"); *Thompson v. Campbell*, 2003 U.S. App. LEXIS 23845, *19 (6th Cir. Nov. 20, 2003) (attached as **Exhibit 4**) ("Without deprivation of a protected interest, [the inmate] has no due process claim separate from his First Amendment claim, which we have already rejected"). Thus, PLN also lacks standing to pursue its Fourteenth Amendment procedural due process claim.

In *Prison Legal News v. Cheshire*, PLN had, like here, sent inmates "promotional sample packets and not paid for subscriptions." 2006 U.S. Dist. LEXIS 48099, *25 (D. Utah June 30, 2006) (attached as **Exhibit 5**). PLN "had no subscribers at the . . . Jail . . . , and, at most, had only a desire to seek potential subscribers." *Id.* at *24-25. On this basis, the court held that PLN was **_not_** entitled to procedural due process protection for rejected publications:

> This court refuses to extend the current state of the case law to provide due process protections to publishers soliciting subscriptions. **Plaintiff's mere**

**inability to sell personal magazine subscriptions at the Jail does not trigger due process protection**. Plaintiff is free to engage in commerce in general. However, the Jail need not allow Plaintiff to enter the Jail or mandate that the Jail change its property rules to allow prisoners to possess individual magazine subscriptions. This fact is crucial because it shows that **Plaintiff did not have a protected interest in receiving notice that these prisoners did not receive its publication. . . . [T]here is no reason to extend the current due process protections available to publishers who have inmate subscribers to publishers seeking to gain subscribers**.

*Id.* at *25-26 (emphasis added).

>       **C.    PLN Lacks Standing to Pursue its First Amendment Claim of Interference with "Legal Mail."**

PLN asserts that Defendants violated its First Amendment rights by censoring letters that were "conspicuously marked 'LEGAL MAIL.'" (**Exhibit 2, p. 3**). Lance Weber, Co-Counsel for PLN, sent these letters on PLN's behalf to inquire about the inmates' "receipt of specific literature from PLN in order to investigate the facts and circumstances of possible violations of [his] client's constitutional rights." (Declaration of Lance Weber, Docket # 25-8, ¶ 10, attached as **Exhibit 6; Exhibit 2, p. 3**).

PLN is self-described as a publisher and a distributor, not "a direct-services legal organization" with "authority to take action on behalf of an inmate." *Sallier v. Brooks*, 343 F.3d 868, 875 (6th Cir. 2003) (finding that mail from the ABA was not "legal mail" on this basis). Supreme Court decisions, which have "emphasized security considerations in upholding greatly restrictive regulations," preclude "giving any special deference" to correspondence from "recognized civil rights groups" and the "news media." *Mann v. Adams*, 846 F.2d 589, 590-91 (9th Cir. 1988).

It is of no consequence that an *attorney* sent these letters on behalf of PLN. Mail is not *per se* "legal mail" simply because it is from an attorney. In *Sallier*, the Sixth Circuit recognized:

**Not all mail that a prisoner receives from a legal source will implicate**

> **constitutionally protected legal mail rights**. Indeed, even mail from a legal source may have little or nothing to do with **protecting a <u>prisoner's access to the courts</u> and other governmental entities to redress grievances** or with **protecting an <u>inmate's relationship with an attorney</u>**.

343 F.3d at 874 (emphasis supplied); *see also United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged"); *Marr v. Jones*, 2010 U.S. Dist. LEXIS 49422, *2 (W.D. Mich. May 19, 2010) (attached as **Exhibit 7**) (finding the plaintiff's argument — "that because the mail was sent to an attorney it automatically constituted legal mail" — to be entirely "without merit"). Mail to or from an inmate is only entitled to "legal mail" status when it evokes the attorney-client privilege. In *Guajardo-Palma v. Martinson*, Judge Posner stated, in relevant part:

> [P]rison employees, who routinely and for obvious reasons of security open prisoners' incoming mail, should be permitted to open incoming mail from a prisoner's lawyer to verify that it is indeed **a communication, related to current or prospective representation**, from a lawyer who is authorized to practice law in the relevant jurisdiction and **is in fact the prisoner's lawyer**. . . . Protection of the privacy of attorney mail in this fashion is imperfect; the prison employee who opens the letter **will have to glance at the content to verify its <u>bona fides</u>**. But the imperfection is necessary to protect the prison's interest in security. . . .

622 F.3d 801, 804-05 (7th Cir. 2010) (emphasis supplied).

It is undisputed that PLN is not representing, nor can it represent, any of the inmates. PLN attempts to salvage its "legal mail" claim by characterizing the letters as "work product." In his declaration, Mr. Weber states:

> I am entitled to conduct my investigation in private and to take measures to keep my communications private by preventing the agents of the Defendants from reading the contents of the work product that I create on behalf of my client, PLN.

(**Exhibit 6**, ¶ 7). PLN does not articulate how its letters are work product, nor does it explain how sending these letters to ***non-client inmates, none of whom are even involved in this***

-6-

*litigation*, entitles the letters to receive privileged "legal mail" handling. See *United States v. Johnson*, 378 F. Supp. 2d 1041, 1045, 1048 (N.D. Iowa 2005) (where an inmate sent work product to someone other than her attorney under the guise of "legal mail," the court classified this as "fraudulent use of attorney-client mail"). Indeed, any privilege attached to this purported work product was waived by voluntary disclosure to third party inmates. *New Phoenix Sunrise Corp. v. Comm'r*, 2010 U.S. App. LEXIS 23909, *26 (6th Cir. Nov. 18, 2010) (attached as **Exhibit 8**) (citations omitted) ("Both the attorney-client privilege and work-product protection are waived by voluntary disclosure of private communications to third parties"). Once a privilege is waived, "waiver is complete and final." *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 307 (6th Cir. 2002). Regardless of how PLN tries to classify its correspondence, it lacks standing to pursue its First Amendment claim of interference with "legal mail."

### D. PLN Lacks Standing to Challenge Defendants' Alleged Refusal to Allow PLN's Attorneys to Interview Inmates in Defendants' Custody.

PLN asserts that Defendants violated its First Amendment rights by refusing to allow its attorneys to interview inmates for the purpose of investigating its claims against Defendants. PLN and its attorneys seem to believe that the First Amendment guarantees members of the free public a constitutional right to express their views "whenever and however and wherever they please." *Adderley v. Florida*, 385 U.S. 39, 48 (1966). But the Supreme Court has "vigorously and forthrightly rejected" this misconception of First Amendment jurisprudence time and time again. *Id.* It has consistently held that the First Amendment "does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Cornelius*

*v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 809 (1985).

PLN's attorneys do not represent any of the inmates and PLN has produced no evidence that any of the intended interviewees requested a meeting with them. In fact, at least one inmate wanted nothing to do with the attorney attempting to interview inmates on PLN's behalf. (Statement of Robert J. McRoberts, attached as **Exhibit 9**). The mere fact that PLN sent its *attorneys* to visit inmates on its behalf, therefore, does not change the analysis. It is a "commonsense principle that attorneys do not possess any right in the first amendment that is not the common legacy of every citizen." *Mezibov v. Allen*, 411 F.3d 712, 719 (6th Cir. 2005) (citation and internal quotations omitted). PLN's asserted right is subject to the same standards that apply to members of the press.

In a trilogy of opinions, the Supreme Court has declared, "<u>explicitly and without reservation</u>, that the media have 'no constitutional right of access to prisons or their inmates beyond that afforded to the general public.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (*quoting Pell v. Procunier*, 417 U.S. 817, 834 (1974) and *Saxbe v. Wash. Post. Co.*, 417 U.S. 843, 850 (1974)) (emphasis supplied).

PLN's asserted right is analogous to that which was asserted by the plaintiffs in *Houchins*. In *Houchins*, personnel and representatives of the media alleged that a jail's refusal to permit them to interview inmates in custody deprived them of their First Amendment rights to "be informed of conditions prevailing in the . . . facility" and to "learn of the prisoners' grievances." 438 U.S. at 4. The Court rejected the notion that such rights exist, finding that the media's rights to gather news and provide information "afford no basis for reading into the Constitution a right of the public or the media to enter these institutions," nor do such rights support "the claim that the First Amendment compels others – private persons or

governments – to supply information." *Id.* at 9, 11; see also *Pell*, 417 U.S. at 834-35 ("It is one thing to say that a journalist is free to seek out sources of information not available to the members of the public, . . . [but it] is quite another thing to suggest that the Constitution imposes upon the government the affirmative duty to make available to journalists sources of information not available to members of the public generally"). The Court went on to note:

> This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control.
> * * *
> Unarticulated but implicit in the assertion that media access to the jail is essential for informed public debate on jail conditions is the assumption that media personnel are the best qualified persons for the task of discovering malfeasance in public institutions. But that assumption finds no support in the decisions of this Court or the First Amendment.
> * * *
> We, therefore, reject the Court of Appeals' conclusory assertion that the public and the media have a First Amendment right to government information regarding the conditions of jails and their inmates. . . .
> * * *
> Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.

*Houchins*, 438 U.S. at 9, 13, 14, 15.

Supreme Court precedent demonstrates that PLN lacks standing to litigate this claim. Standing requires a *particularized* injury, meaning "that the injury must affect the plaintiff in a ***personal and individual way***." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011) (emphasis supplied). PLN's challenge to Defendants' alleged refusal to allow PLN's attorneys to interview inmates, however, is "no more than a particularized application of the general rule that nobody may enter a prison and designate an inmate with whom he would like to visit, unless the prospective visitor is a lawyer, clergyman, relative, or friend of that inmate." *Saxbe*, 417 U.S. at 849. If PLN has suffered an "injury" by the inability to break through the locked doors of the Jail and gain unfettered access to inmates, then every member of the free

public has suffered an "injury." This type of "injury" is insufficient for purposes of Article III standing. The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *United States v. Hays*, 515 U.S. 737, 743 (1995) (collecting cases).

PLN tries to evade the holdings of *Pell*, *Saxbe*, and *Houchins* by characterizing its claim as a right to "engage[ ] in litigation and advocacy as a method of advancing social and political goals." In so doing, PLN relies on *NAACP v. Button*, 371 U.S. 415 (1963) and *In re Primus*, 436 U.S. 412 (1978). **(Exhibit 2, p. 15)**. In *Button*, a state statute prohibited the NAACP from encouraging potential litigants to challenge segregation in public schools with the assistance of the NAACP's legal staff. 371 U.S. at 419. Finding "that the activities of the NAACP . . . are modes of expression and association protected by the First and Fourteenth Amendments," the Supreme Court held that the statute prohibiting these activities, as applied to NAACP, violated its First Amendment rights. *Id.* at 428-29. Similarly, in *Primus*, a staff attorney from the ACLU was reprimanded for soliciting a potential litigant who had been sterilized as a condition of receiving public medical assistance. 436 U.S. at 415, 439. The Supreme Court found that "the ACLU engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *Id.* at 431. It therefore concluded that the state's disciplinary rules could not be constitutionally applied to the ACLU attorney, whose solicitation was "intended to advance beliefs and ideas." *Id.* at 438 n. 2, 439.

PLN argues that *Button* and *Primus* permit "expansive access" to inmates. It necessarily follows, according to PLN, that *Button* and *Primus* must "permit[ ] attorneys for PLN to communicate with inmates on the much narrower issue of the facts and circumstances attendant to the violations of PLN's constitutional rights. . . ." **(Exhibit 2, p. 17)**. To support this

position, PLN cites and relies upon *Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1982). PLN's interpretation of *Button* and *Primus* is flawed and its reliance on *Jean* is misplaced.

*Button* and *Primus* do not permit "expansive access" to inmates. They "recognize a **_narrow_** First Amendment right" of attorneys to "solicit clients to engage in litigation as a form of political expression." *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1513, 1514 (11th Cir. 1992) (emphasis supplied). This is not the First Amendment right asserted by PLN. Brian Prain, the attorney who sought to interview inmates on behalf of PLN, certifies that he "was not there for the purpose of soliciting legal representation of any of [the inmates]" and that he "did not ever intent to represent any of them." (Declaration of Brian Prain, Docket # 25-5, ¶ 6, attached as **Exhibit 10**). The right asserted by PLN, rather, is unfettered access to inmates for the purpose of conducting informal discovery to support its claims, the expense of which is to be borne by the taxpayers who fund the operation of the Livingston County Jail. Neither *Button* nor *Primus* ever recognized or implied such a right.

PLN's reliance on dictum from the Eleventh Circuit's decision in *Jean* to suggest otherwise is unavailing. Ten years after *Jean*, the Eleventh Circuit clarified that *Button* and *Primus* "do not recognize a right of access to persons properly in government custody." *HRC*, 953 F.2d at 1512. The Eleventh Circuit explained:

> In reality, [the political organization]'s claim is that it has a right to associate with [detainees] and it has a right to compel the Government to assist it in exercising that right. **The Constitution, however, does not require the Government to assist the holder of a constitutional right in the exercise of that right**. . . . Thus, associational freedom in no way implies a right to compel the Government to provide access to those with whom one wishes to associate. . . . **Certainly, neither _Button_ nor _In re Primus_ supports the conclusion that the Government infringes associational freedom when it denies access to those whom it lawfully detains**.
>                                    * * *
> [The organization]'s claim is, therefore, nothing more than a claim that it has a right to compel the Government to assist it in exercising a right of association.

> **Any court order enforcing this so-called "right" would impose an inappropriate affirmative obligation on the Government. This is more than the Constitution requires**. We hold, therefore, that [the organization]'s claim to a right of access to the [detainees] is not a claim upon which relief can be granted and instruct the district court on remand to dismiss it.

*Id.* at 1513-15 (emphasis supplied). The District of Columbia Circuit came to the same

conclusion in *Ukranian-American Bar Association, Inc. v. Baker*, 893 F.2d 1374 (D.C. Cir. 1990):

> **We see no theory, in *Button* or elsewhere, by which the Constitution guarantees the plaintiffs governmental assistance in pursuing their political objectives**. . . . From cases concerning a lawyer's right to advertise for and to solicit clients, . . . plaintiffs argue that their right of access to potential clients outweighs any countervailing governmental interest. **Those cases, however, protect only the first amendment right to engage in such activities free from governmental interference; they do not establish an affirmative right to the Government's assistance in identifying and furnishing information to potential clients. Nor do they allow that lawyers have any right in the first amendment that is not the common legacy of every citizen**. Insofar as a dictum in *Jean v. Nelson* . . . suggests that "counsel have a first amendment right to inform [detainees] of their rights, at least when they do so as an exercise of political speech without expectation of remuneration," we respectfully disagree.
>
>             * * *
>
> Plaintiffs' assertion that the first amendment guarantees them access to [detainees incorrectly assumes that government property is analogous to] a public forum, wherein all persons have a right to express their views. . . . **If there were a first amendment right to speak in such a forum, the Government might find it very difficult to get on with the business of governing**. To admit everyone who would like to advise the [detainee] . . . and to communicate their offers of assistance would impose a **substantial burden** upon the Government [and] . . . would **divert the Government from its priorit[ies]**. . . .
>
>             * * *
>
> [L]awyers have no special first amendment status -- that is independent of the [detainee]'s right to counsel. . . . [T]he Government would not have to permit a lawyer to speak with [a detainee] unless [the detainee] asserted that right. . . . **Where it is the attorney who claims the right to have such advice conveyed, we should be even less prepared to rule that the first amendment requires the Government to lend its assistance**.

*Id.* at 1380-82 (emphasis supplied).

    *Button* and *Primus* provide no basis for finding that PLN has standing. Nor does PLN's

-12-

2:11-cv-13460-DPH-MAR   Doc # 32   Filed 02/09/12   Pg 23 of 44   Pg ID 1120

suggestion that its rights are "inextricably intertwined" with the inmates. (**Exhibit 2**, p. 17).

PLN "cannot allege the constitutional harm of any of the inmates at the Jail to confer standing

on its claims." *Cheshire*, 2006 U.S. Dist. LEXIS 48099, at *10 (citing *U.S. Dep't of Labor v. Triplett*,

494 U.S. 715 (1990)).

## II.   PLN HAS FAILED TO CARRY ITS HEAVY BURDEN OF ESTABLISHING ENTITLEMENT TO THE EXTRAORDINARY RELIEF SOUGHT.

The relief sought by PLN is disfavored by courts. A preliminary injunction is an

"extraordinary remedy involving the exercise of a very far-reaching power, which is to be

applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228

F.3d 729, 739 (6th Cir. 2000) (citation and internal quotations and alterations omitted).

Because preliminary injunctive relief "is reserved for only the most egregious case," such relief

"should not be extended to cases which are doubtful or do not come within well-established

principles of law." *Chrysler Group LLC v. Moda Group LLC*, 796 F. Supp. 2d 866, 870 (E.D. Mich.

2011) (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001)).

The already-disfavored remedy of a preliminary injunction is even more disfavored in

the prison environment. "Where a prison inmate seeks an order enjoining state prison

officials, this court is required to proceed with the utmost care and must recognize the unique

nature of the prison setting." *Mitchell v. Mich. Dep't of Corr.*, 2006 U.S. Dist. LEXIS 99599, *4

(E.D. Mich. March 31, 2006) (attached as **Exhibit 11**) (citing *Kendrick v. Bland*, 740 F.2d 432,

438, n. 3 (6th Cir. 1984)); see also *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). "[S]weeping

intervention in the management of state prisons is rarely appropriate when exercising the

equitable powers of the federal courts." *Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994)

(vacating an order of preliminary injunction). Indeed, as recognized by this Court, "***ANY***

interference by the federal courts in the administration of state prison matters is necessarily

-13-

disruptive." *Anderson v. Prisoner Health Servs.*, 2011 U.S. Dist. LEXIS 57663, *6 (E.D. Mich. May 31, 2011) (attached as **Exhibit 12**) (citation omitted) (emphasis supplied).

In determining whether a preliminary injunction is warranted, the Court should consider four factors: (1) whether PLN has a strong likelihood of success on the merits, (2) whether PLN would suffer irreparable injury absent an injunction, (3) whether issuance of an injunction would cause substantial harm to others, and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998). This Court need not make a finding as to each factor if "fewer are dispositive of the issue." *Barden Detroit Casino L.L.C. v. City of Detroit*, 59 F. Supp. 2d 641, 657 (E.D. Mich. 1999). A finding that there is no likelihood of success on the merits "is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

PLN bears a heavy burden, as the proof required for preliminary injunctive relief "is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739. PLN has not carried this heavy burden. For the reasons set forth below, PLN's request for preliminary injunctive relief should be denied.

**A.     PLN is Unlikely to Prevail on the Merits.**

**1.     *PLN's Asserted Rights are Not Constitutionally Protected.***

Defendants incorporate by reference the arguments set forth in **Section I.A.-D.**, *supra*, to support their position that PLN's asserted rights are not constitutionally protected and its claims fail as a matter of law. See *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (explaining that a claimant *lacks standing* in the absence of an "arguable" cause of action, whereas a claimant *fails to state a claim* in the absence of a "valid" cause of action).

With respect to the alleged censorship of the softback book *Protecting Your Health &*

-14-

*Safety* and the informational brochures, additional bases exist for finding that PLN has failed to state a claim upon which relief can be granted. *Protecting Your Health & Safety* is not published by PLN. It is authored by Robert Toone and published by Southern Poverty Law Center. (Declaration of Paul Shaposka, Jr., Docket # 25-6, Exhibit B, attached as **Exhibit 13**). Thus, PLN's asserted right to distribute this book is foreclosed by the publishers-only rule. See *Bell v. Wolfish*, 441 U.S. 520, 550 (1979) (prison regulations prohibiting receipt of hardback books, unless mailed directly from the publisher, a book club, or a bookstore, are constitutional); *Ward v. Washtenaw County Sheriff's Dep't*, 881 F.2d 325, 329 (6th Cir. 1989) (extending the holding of *Bell* to softcover publications). Nothing about PLN's challenge to the alleged censorship of this book "overcomes these controlling precedents." *Thompson*, 2003 U.S. App. LEXIS 23845, at *17-18.

PLN's Motion for Preliminary Injunction reveals that "informational brochures," as alleged in its Complaint, are actually order forms for subscriptions to *Prison Legal News* and books offered by PLN. (**Exhibit 2**, p. 2); (Declaration of Paul Wright, Docket # 25-2, ¶ 6, attached as **Exhibit 14**); (**Exhibit 10**, ¶ 14(d)); (**Exhibit 13**, Exhibit A). These "informational brochures" are analogous to "free advertising," the censorship of which is not a constitutional violation. *Kalasho*, 868 F. Supp. at 886-88; *Sheets*, 97 F.3d at 169.

### 2.   *PLN's Asserted Rights, if Constitutionally Protected, Cannot Withstand the* Turner *Analysis.*

PLN challenges Defendants' postcard-only mail policy, which restricts incoming and outgoing correspondence, except for bona-fide "legal mail," to standard 4" x 6" postcards. (Policy 5(d)1, Effective 02/09/2011, attached as **Exhibit 15**). PLN maintains that the postcard-only mail policy "bans all books, magazines and newspapers" and that its "books and magazines have been censored pursuant to this policy." (**Exhibit 2**, p. 7). Because PLN

extended no effort to obtain Defendants' formal mail policies and review them collectively, PLN fails to appreciate that a separate policy pertains to books, magazines, and other reading materials.

Under Policy 5(e)1, a publication will be delivered to an inmate so long as (1) the inmate is still incarcerated; (2) the publication is (i) legally available to the public, (ii) approved by Inmate Services, (iii) a subscription, the costs of which are borne by the inmate, and (iv) mailed directly from the publisher; and (3) the publication does not contain (i) specific information regarding weapons, explosives, incendiary devices, poisons, or other dangerous drugs, (ii) inflammatory writings advocating disorder, violence or insurrection against correctional personnel or facilities, (iii) pornographic materials, (iv) instructional material in the martial arts, or (v) any other materials that pose a safety or security risk, or interfere with the orderly operation of the Jail. (Policy 5(e)1, Effective 12/05/2006, attached as **Exhibit 16**). PLN's argument that "Defendants have relied on a claim that unsolicited mail is not allowed in an attempt to cover up their improper censorship of PLN's mail and in order to avoid any discussion of their illegal 'postcards only' policy" (**Exhibit 2**, p. 12) is, therefore, meritless.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court formulated a standard of review for constitutional challenges to prison and jail regulations. At the outset of its decision, the Court recognized that separation of powers necessitated a standard that ceded considerable deference to the judgment of prison officials:

> [C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . . [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation

2:11-cv-13460-DPH-MAR   Doc # 32   Filed 02/09/12   Pg 27 of 44   Pg ID 1124

> of powers concerns counsel a policy of judicial restraint. Where a state penal
> system is involved, federal courts have . . . additional reason to accord deference
> to the appropriate prison authorities.

*Id.* at 84-85 (internal quotations and citations omitted). The Court therefore adopted a

"reasonableness" standard to evaluate the validity of jail and prison regulations. *Id.* at 89.

Under the "reasonableness" standard, colloquially referred to as the *Turner* test, a jail

regulation will be constitutionally valid "if it is reasonably related to legitimate penological

interests." *Id.* Although this standard is considerably "less restrictive than that ordinarily

applied to alleged infringements of fundamental constitutional rights," *O'Lone v. Estate of*

*Shabazz,* 482 U.S. 342, 349 (1987), the Supreme Court found that "such a standard is necessary

if prison administrators . . . , and not the courts, [are] to make the difficult judgments

concerning institutional operations." *Turner,* 482 U.S. at 89 (citation and internal quotations

omitted). In so finding, the Court explained:

> Subjecting the day-to-day judgments of prison officials to an inflexible strict
> scrutiny analysis would seriously hamper their ability to anticipate security
> problems and to adopt innovative solutions to the intractable problems of
> prison administration. The rule would also distort the decisionmaking process,
> for every administrative judgment would be subject to the possibility that some
> court somewhere would conclude that it had a less restrictive way of solving the
> problem at hand. Courts inevitably would become the primary arbiters of what
> constitutes the best solution to every administrative problem, thereby
> unnecessarily perpetuating the involvement of the federal courts in affairs of
> prison administration.

*Id.* (citation, quotations, and alteration omitted). Post-*Turner,* the Supreme Court has

continued to adhere to a policy of judicial restraint:

> [W]e have been sensitive to the delicate balance that prison administrators
> must strike between the order and security of the internal prison environment
> and the legitimate demands of those on the "outside" who seek to enter that
> environment, in person or through the written word. . . . [P]rison officials may
> well conclude that certain proposed interactions, though seemingly innocuous
> to laymen, have potentially significant implications for the order and security
> of the prison. **Acknowledging the expertise of these officials and that the**

-17-

> judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded <u>considerable deference to the determinations of prison administrators</u> who, in the interest of security, regulate the relations between prisoners and the outside world.

*Thornburgh*, 490 U.S. at 407-08 (emphasis added) (citations omitted). This Court and the Sixth Circuit have likewise stressed the importance of judicial restraint, even when jail regulations "affect... constitutional rights... in a manner [they] find discomforting." *Brown v. Johnson*, 743 F.2d 408, 412-13 (6th Cir. 1984); *see also Kalasho*, 868 F. Supp. at 886-86 (stating that "federal court's [sic] must impart considerable deference to the expertise of state prison officials when reviewing challenged regulations").

Four factors are relevant to the determination of whether a prison regulation is constitutionally reasonable: (1) whether the regulation is content-neutral and rationally related to a legitimate government interest, (ii) whether alternative means of exercising the right remain open, (iii) the impact that accommodation of the asserted right will have on others (prison officials and inmates) in the prison, and (iv) whether there are obvious, easy alternatives such that the regulation can be viewed as an "exaggerated response" to prison concerns. *Thornburgh*, 490 U.S. at 414-18; *Turner*, 482 U.S. at 89-91. Nothing in *Turner* or its progeny requires "a trial court... to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (collecting cases). "The real task... is not balancing these factors, but rather determining whether the [prison official] shows more than simply a logical relation, that is, whether he shows a *reasonable* relation." *Beard v. Banks*, 548 U.S. 521, 533 (2006) (emphasis in original). The first factor is, therefore, the linchpin of the analysis. *Id.* at 532.

The burden is not on Defendants to prove the validity of their policies, but on PLN to disprove it. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). In order for PLN to carry this "**heavy**

**burden**," it "must overcome **the presumption**" that Defendants "acted within their 'broad discretion.'" *Shaw v. Murphy*, 532 U.S. 223, 232 (2001) (emphasis added).

PLN will not carry its heavy burden. A majority of PLN's *Turner* analysis relies on the mistaken assumption that the postcard-only mail policy prohibits receipt of publications. Defendants' publications policy is consistent with controlling precedent and their postcard-only mail policy has been upheld as constitutional by several district courts. See, e.g., *Covell v. Arpaio*, 662 F. Supp. 2d 1146 (D. Ariz. 2009); *Gambuzza v. Parmenter*, 2010 U.S. Dist. LEXIS 60444 (M.D. Fla. May 28, 2010) (attached as **Exhibit 17**) (collecting cases) ("A review of the case law on the issue of post-card only inmate mail . . . convinces the Court that the present Complaint lacks an arguable basis in law because the Courts have found that the post-card only mail policy is 'reasonably related to legitimate penological interests'"). A faithful application of the *Turner* factors, moreover, demonstrates that Defendants' mail policies are constitutional.

> ### i.    Defendants' Content-Neutral Policies are Rationally Related to Legitimate Government Interests.

Jail regulations are content-neutral if they restrict rights "without regard to the content of the expression." *Thornburgh*, 490 U.S. at 415. The legitimacy aspect of this factor requires the Court to examine the purpose of the policy. *Id.* A jail regulation will be invalidated only where "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. That a regulation may produce apparent inconsistencies, however, does not necessarily imply that the regulation is arbitrary or irrational. *Thornburgh*, 490 U.S. at 417 n. 15. Deference to the judgment of prison officials is particularly important where, as here, "the regulations at issue concern the entry of materials into the prison. . . ." *Thornburgh*, 490 U.S. at 416.

Because the prison environment involves "the ever-present potential for violent

confrontation and conflagration," the Supreme Court has found that "[r]esponsible prison officials must be permitted to take reasonable steps to forestall such a threat . . . before the time when they can compile a dossier on the eve of a riot." *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132-33 (1977).  Thus, prison officials "need not demonstrate an *actual* danger in order to support the reasonableness of their determinations. It is enough to show that a *potential* danger exists without the restrictions of a challenged prison regulation." *Brown*, 743 F.2d at 413.  This remains true even if such a showing would be "unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public." *Pell*, 417 U.S. at 825.

**Postcard Policy**: The postcard policy is content-neutral; it limits the method of communication without limiting the substance or suppressing expression. *Covell*, 662 F. Supp. 2d at 1153.  It applies equally to *all* correspondence except bona-fide legal mail.

One of the purposes of this policy is to reduce the burden on Jail administrative/support staff. Over the past few years, the Jail has experienced a rising inmate population and a corresponding increase in inmate mail. (Affidavit of Lieutenant Cremonte, attached as **Exhibit 18**). In 2002, the average daily population was approximately 184 inmates. By 2007, the average daily population reached capacity with approximately 254 inmates, and has remained at or near capacity ever since. In addition to the population increase, the type or risk of inmate has dramatically changed since 2002. In 2011, one-third of the Jail population was addicted to heroin or other opiates. The mental health population has also increased. Jail staff have had to absorb this burden without additional funding and staffing. In fact, Jail staff have had to absorb this burden with a *loss* of funding and staffing.  Between 2005 and 2008, six positions held by full-time support staff were eliminated due to financial constraints.  In

addition, three full-time clerks assigned to the Jail had to be laid off in 2008. Jail staff were forced to do more with less. They were assigned many duties in addition to their regular duties, including, but not limited to, security of court video conferencing, judicial aide, and security-related functions. (**Exhibit 18**).

Conservation and proper allocation of jail resources are legitimate government interests in the corrections context. See, e.g., *Spies*, 173 F.3d at 404; *Brown v. Gerth*, 2007 U.S. Dist. LEXIS 97875, *11 (W.D. Mich. June 6, 2007) (attached as **Exhibit 19**); *Jones v. Campbell*, 2001 U.S. App. LEXIS 24541, *14 (6th Cir. Nov. 9, 2001)  PLN argues that the policy is not rationally related to these interests, but backs this up with nothing but conclusory, unsupported assertions. (**Exhibit 2**, pp. 8-9). Before implementing the postcard policy, Jail staff would spend a full, eight-hour work day processing inmate mail, which often required the assistance of other deputies. Mail processing time has been cut in half — from eight hours per day to four — since the implementation of the policy. (**Exhibit 18**). Thus, the postcard policy is rationally related to the legitimate government interest of conserving Jail resources.

This government interest is related to another, equally important purpose of the policy: maintaining security and safety for inmates and Jail officials. Reducing the burden on the administrative staff reduces the likelihood of serious errors; namely, failing to detect and allowing contraband into the Jail. This is especially important with the higher-risk inmate population. (**Exhibit 18**).

Jail security is a legitimate purpose, one that is "central to all other corrections goals." *Thornburgh*, 490 U.S. at 415 (citation omitted); see also *O'Lone*, 482 U.S. at 348 (stating that "deterrence of crime, rehabilitation of prisoners, and institutional security" are "valid penological objectives"). PLN argues that the postcard policy is not rationally related to

-21-

enhancing security because the previous mail policy "already prohibit[ed] people from sending contraband to inmates at the Livingston County Jail." (**Exhibit 2**, p. 9). This argument displays ignorance. The smuggling of contraband is a security concern at virtually every jail and prison, all of which most certainly have a policy prohibiting contraband, and the Livingston County Jail is no exception. A variety of drugs, including powders and marijuana, razor blades and other weapons, and bodily fluids have been concealed in envelopes and under stamps. The entry of contraband into the Jail has resulted in inmate violence and disorder. (**Exhibit 18**). Threats to witnesses, victims, and other persons, as well as unlawful business transactions and solicitation, have been buried in lengthy communications. The postcard policy has reduced contraband smuggling and occurrences of threatening or unlawful communications. It has also allowed Jail staff to attend to their other duties, including important security-related functions. (**Exhibit 18**). Therefore, the policy is rationally related to the legitimate government interest of maintaining institutional security for inmates and Jail officials. See *Covell*, 662 F. Supp. 2d at 1153 (finding that the postcard-only mail policy was rationally related to the legitimate penological goal of reducing the smuggling of contraband into the jail).

**Publications Policy**: The publications policy, which prohibits unsolicited/non-subscription publications, is neutral in that it bans *all* unsolicited/non-subscription materials, regardless of content. See *Ligons v. Perez*, 2009 Minn. App. Unpub. LEXIS 1306, *9 (Minn. Ct. App. Dec. 15, 2009) (attached as **Exhibit 20**) (subscription-only policy was neutral because all publications were "subject to the same policy" and the ban on non-subscription publications applied "regardless of their content or the identity of the publisher"); see also *Kalasho*, 868 F. Supp. at 887; *Sheets*, 97 F.3d at 168; *Jones*, 2001 U.S. App. LEXIS 24541, at *3, 14.

The publications policy is designed, in part, to reduce the burden on administrative

-22-

staff. **(Exhibit 18)**.    Sorting, screening, and delivering unsolicited/non-subscription publications would impose a substantial burden on an already-overtaxed system.  It would also slow the delivery of personal correspondence, legal mail, and ordered/subscribed-to materials.    Prohibiting unsolicited/non-subscription publications allows for a more streamlined, efficient process of handling inmate mail. **(Exhibit 18)**.

The policy is also designed to maintain and promote security.  Sorting, screening, and delivering unsolicited/non-subscription publications would increase the risk of contraband entering the Jail.  If inmates were permitted to receive unsolicited/non-subscription publications, an excessive amount of materials would accumulate in their cells, allowing inmates to conceal contraband and posing fire hazards and sanitation concerns. **(Exhibit 18)**. Additionally, there is always the potential for violence and disorder when materials enter the Jail.  In *Thornburgh*, the Supreme Court observed that incoming mail is of a "categorically [greater] magnitude" than outgoing mail:

> Once in the prison, [incoming publications] reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. Furthermore, prisoners may observe particular material in the possession of a fellow prisoner ... and cause disorder by acting accordingly. ... The problem is not ... in the individual reading the materials in most cases. The problem is in the material getting into the prison. ... In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder.

490 U.S. at 412-13 (internal quotations and citations omitted).

The government interests that justify Defendants' policy are substantially similar to those that justify regulations banning third class mail.  In *Jones*, the regulation at issue was designed to "prevent unsolicited mail from being sent to inmates due to concerns about the significant amount of time and resources expended in the examination and delivery of these unsolicited materials by mail room staff," who must "check every item for contraband." 2001

U.S. App. LEXIS 24541, at *14. The Sixth Circuit found this purpose to be legitimate. *Id.* In *Kalasho*, this Court found that a "tremendous influx of incoming prisoner mail . . . poses the possibility of a serious security threat to the institution." 868 F. Supp. at 887. Thus, the Court held that the government interest was "legitimate, as it relates to legitimate security concerns." *Id.*; see also *Sheets*, 97 F.3d at 168 (finding the reasoning in *Kalasho* persuasive).

In *Ligons*, the court held that a subscription-only policy, which was "designed to maintain security within the prison, limit the administrative burden on staff, and create an efficient system for reviewing inmate mail for contraband," was "neither arbitrary nor irrational." 2009 Minn. App. Unpub. LEXIS 1306, at *7-8. The court found that the "legitimate security interest in screening magazines would be compromised" if prison staff were required to screen non-subscription publications. *Id.* at *8.

Similarly, in *Kaufman v. Karlen*, 2007 U.S. Dist. LEXIS 45568 (W.D. Wis. June 21, 2007) (attached as **Exhibit 21**), the prison implemented a policy banning free publications to, *inter alia*, "reduce the volume of mail that prison staff must inspect" because "the volume of free mail created a backlog in the delivery of other mail to prisoners." *Id.* at *8, 42. The court found that the prison regulation banning unsolicited publications and other free mailings was rationally related to this legitimate government interest. *Id.* at *42.

Furthermore, the distinction between jails and prisons is a relevant consideration. Courts have upheld much greater restrictions on this basis. In *Cheshire*, for example, the district court held that a jail regulation banning *all* subscriptions and allowing "access to periodicals only through the Jail library" was "reasonably related to the Jail's legitimate penological interests." 2006 U.S. Dist. LEXIS 48099, at *18. In addition to the government interests described above, the *Cheshire* court recognized:

The Jail must review all incoming mail for a variety of security reasons. Allowing publications from various sources would require more intense scrutiny of each publication and require the review of potentially hundreds or thousands of publications each month. Moreover, many of these inmates would be released or transferred soon after receiving their publications but the Jail would continue to receive the publication.

* * *

The policy . . . helps conserve limited Jail resources in terms of monetary costs and correctional officer time. After the subscription is started, the Jail must handle the magazine as inmate property. Before it does so, the mail room must carefully review and inspect the magazine to ensure it does not contain contraband. . . . The court finds that the critical fact in analyzing this case is the short stay of inmates at the Jail. Jail inmates stay an average of 30.7 days. This time is not sufficient to even begin a subscription to PLN. It takes 4-6 weeks to begin subscriptions to PLN. Due to the transitory nature of inmates in jails, as opposed to prison inmates, PLN has subscribers in less than one percent of the 3,600 jails in this country according to the editor of PLN. Although the average state and federal inmates stay in the Jail slightly longer on average, Defendants cannot predict how long either state, federal, or local inmates will remain in the jail. All inmates are subject to being moved by stated [sic] and federal authorities with short notice. In fact, none of the inmates who provided affidavits in this case are still at the Jail.

*Id.* at *15-18.

### ii. Alternative Means of Exercising the Asserted Rights Remain Open.

Under this factor, the asserted constitutional right must be viewed "sensibly and expansively." *Thornburgh*, 490 U.S. at 417. "Where 'other avenues' remain available for the exercise of the asserted right . . . , courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Turner*, 482 U.S. at 90 (citation omitted). If the challenged regulation "permit[s] a broad range of publications to be sent, received, and read, this factor is clearly satisfied." *Thornburgh*, 490 U.S. at 418.

**Postcard Policy**: PLN claims that it does not have available alternatives because it lacks the equipment necessary to print postcards and cannot tailor many of its mailings to

postcards. (**Exhibit 2**, p. 12; **Exhibit 14**, ¶ 12). It further claims that telephone calls and in-person visits would be ineffective to convey its message. This argument is unavailing and insufficient to satisfy the second factor of the *Turner* test. The Supreme Court has held that while alternative means of exercising the right must be available, they do not have to be ideal. *Overton*, 539 U.S. at 135. Relying on this authority, the court in *Covell* found that "postcards, telephones, and jail visits may in Plaintiff's view be less than ideal means of communicating with his family and friends, but jail-provided alternatives need not be ideal." 662 F. Supp. 2d at 1154 (citing *Overton*, 539 U.S. at 135).

PLN further complains that postcards cost $0.83, not including postage. (**Exhibit 14**, ¶ 12). In an effort to assert the rights of others, PLN maintains that the postcard policy "causes significant inconvenience and increased costs . . . to . . . family members, friends, and professionals such as doctors. . . ." (**Exhibit 2**, p. 11). The Supreme Court has made clear, however, "that losing . . . cost advantages does not fundamentally implicate *free speech* values." *Jones*, 433 U.S. at 130-31 (emphasis in original).

**Publications Policy**: Because the policy "permit[s] a broad range of publications to be sent, received, and read, this factor is clearly satisfied." *Thornburgh*, 490 U.S. at 418. In *Ligons*, the court found that this *Turner* factor was met because the subscription-only policy, like Defendants' policy, "expressly permits inmates to receive magazines by subscription" and "books directly from vendors or publishers." 2009 Minn. App. Unpub. LEXIS 1306, at *11. Likewise, the court in *Kaufman* found that the policy banning free publications met this factor because inmates were free to order or subscribe to any published material, provided it was not objectionable on other grounds, such as security. 2007 U.S. Dist. LEXIS 45568, at *42-43.

Furthermore, if PLN's mission is to communicate with inmates, there is nothing

-26-

stopping PLN from donating its materials to the Jail library. **(Exhibit 18)**; see, e.g., *Kaufman*,

2007 U.S. Dist. LEXIS 45568, at *42 (regulation banning free publications satisfied this *Turner*

factor because "free material may be donated to the prison library where it will be shelved if

it meets other requirements established by the prison librarian"); *Kalasho*, 868 F. Supp. at 887

(sufficient for an inmate to view a particular publication available in the prison store). In

*Cheshire*, the court found that a jail library was an adequate alternative to a categorical ban on

all subscriptions:

> Jail libraries have been upheld as constitutional alternatives when inmates were
> denied personal subscriptions. . . . Plaintiff's affidavits stating that popular
> magazines are hard to get are irrelevant to the issue of whether PLN's right to
> communicate with prisoners can be done effectively through means other than
> individual subscriptions. . . .
>
> * * *
>
> Given the transitory nature of the prison population at the Jail, the library
> subscriptions are an adequate alternative means that allow inmates access to
> PLN. . . . Plaintiff has stated that its goal is to have its information disseminated
> to the inmates. This goal is satisfied by the subscriptions in the Jail library.
> Therefore, Plaintiff has not met its burden of demonstrating that the
> subscriptions in the library are not an adequate alternative means.

2006 U.S. Dist. LEXIS 48099, at *18-20.

### iii. Accommodation of PLN's Asserted Rights Would Have a Substantial Impact on Defendants' Resources and Ability to Maintain Institutional Order.

This factor analyzes "the impact that accommodation of the asserted constitutional

right will have on others (guards and inmates) in the prison." *Thornburgh*, 490 U.S. at 418.

When addressing this factor, it is important for the Court to recognize that "[i]n the necessarily

closed environment of the correctional institution, few changes will have no ramifications on

the liberty of others or on the use of a prison's limited resources for preserving institutional

order." *Turner*, 482 U.S. at 90. When accommodation of a claimant's demands "would cause

a significant reallocation of the prison system's financial resources and would impair the

ability of corrections officers to protect all who are inside a prison's walls," *Overton*, 539 U.S. at 135, "guards and other prisoners alike," *Thornburgh*, 490 U.S. at 418, courts should be "'particularly' deferential to prison administrators' regulatory judgments." *Overton*, 539 U.S. at 135 (citation omitted); see also *Turner*, 482 U.S. at 90.

 **Postcard Policy**: Returning to the old policy would impose a substantial burden on an already-burdened administrative staff, who expend a significant amount of time and resources processing inmate mail. Further, deputies would have to assist with mail processing, which diverts their attention from security and safety concerns within the Jail. Returning to the old policy would increase the likelihood of contraband entering the Jail, which often leads to disorder. As the *Covell* court found, "[t]he asserted 'ripple effect' here is sufficient to tip the third factor in Defendant's favor." *Covell*, 662 F. Supp. 2d at 1154. PLN's analysis of this factor, again, rests on the mistaken assumption that the postcard policy prohibits all publications. Therefore, PLN has not satisfied its burden.

 **Publications Policy**: PLN asks this Court to find that its materials "are entitled to special protection" because they "address[ ] issues of corrections policy and other social and political matters of public concern" and constitute "core protected speech." (**Exhibit 2**, p. 5) (quoting in part *Connick v. Myers*, 461 U.S. 138, 145 (1983)). In *Shaw*, the Supreme Court considered "whether *Turner* permits an increase in constitutional protection" for communications containing certain content and "conclude[d] that it does not." 532 U.S. at 230. The *Shaw* Court explained:

> To increase the constitutional protection based upon the content of a communication first requires an assessment of the value of that content. But the *Turner* test, by its terms, simply does not accommodate valuations of content.
>
>     * * *
>
> If courts were permitted to enhance constitutional protection based on their

-28-

assessments of the content of the particular communications, courts would be in a position to assume a greater role in decisions affecting prison administration. Seeking to avoid unnecessarily perpetuating the involvement of the federal courts in affairs of prison administration, we reject an alteration of the *Turner* analysis that would entail additional federal-court oversight.

*Id.* at 230-31.

*Shaw* dictates that Defendants cannot, under *Turner*, give "special protection" to PLN's publications, or any publication for that matter, on the basis that they contain "core protected speech." Thus, if Defendants are forced to serve as *de facto* distributors for PLN's unsolicited materials, they would be forced to distribute *all* unsolicited materials from *all* publishers seeking access to inmates or face burdensome, repetitive lawsuits.

Jail staff are already being asked to do more with less in a challenging fiscal climate that has plagued Livingston County Jail, and all county jails for that matter. If unsolicited/non-subscription materials were allowed, Jail officials "would be quickly overwhelmed in the mechanics of sorting and delivering to each prisoner--possibly vast amounts of–[unsolicited] mail while ensuring no contraband enters the prison." *Kalasho*, 868 F. Supp. at 888. The court in *Ligons* found that allowing inmates to receive non-subscription publications would "adversely affect the [prison's] ability to process inmate mail," as it would lead to delays in the screening process, which could then lead to "inmate complaints that may cause substantial disruption." 2009 Minn. App. Unpub. LEXIS 1306, at *12. Given the prison's "financial constraints and the increasing inmate population," the court concluded that permitting inmates to receive non-subscription publications "would have a substantial adverse impact on prison resources." 2009 Minn. App. LEXIS 1306, at *13; see also *Kaufman*, 2007 U.S. Dist. LEXIS 45568, at *43 (same).

Because inmates are a captive audience, many publishers send unsolicited publications

to new inmates in efforts to externalize the costs of gaining readership. The Jail has a transitory population; inmates stay at the Jail an average of 16-17 days. (**Exhibit 18**). If the Jail had to accommodate publishers soliciting new inmates, this would create a voluminous influx of publications and other literature. The Jail does not have the resources to make these accommodations. (**Exhibit 18**). Nor should it be forced to expend public resources to accommodate private business interests when, (a) at an average stay of 16-17 days, the vast majority of inmates are not incarcerated for a sufficient length of time to even begin a subscription, and (b) given the transitory population, many unsolicited/non-subscription materials are addressed to inmates no longer in custody. PLN's mailings are a prime example. (**Exhibit 18, ¶ 21**). The *Cheshire* court found that the third *Turner* factor weighed in jail officials' favor on this basis:

> [T]his case involves issues of the magazine that were sent to individual inmates on a solicitation basis. If PLN routinely solicited new inmates in an attempt to gain readership, the amount of publications coming into the Jail would increase even further, especially given the turnover of the inmate population at the Jail. The Jail obviously has limited resources to commit to these types of activities.

2006 U.S. Dist. LEXIS 48099, at *21. The court further found that if "every publisher who wished to gain or solicit inmate subscribers was entitled to notice, the burden could be significant." *Id.* at *26. The court refused to "extend the current due process protections available to publishers who have inmate subscribers to publishers seeking to gain subscribers." *Id.* The court concluded that PLN failed to satisfy "its burden in demonstrating that there would not be an impact on the Jail's orderly management of the facility." *Id.* at *22.

### iv.      There are No Obvious, Easy Alternatives.

This factor does not compel the Court to apply a "least restrictive alternative" test. *Turner*, 482 U.S. at 90. Neither courts nor prison officials are required "to set up or shoot down

every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91; *Spies*, 173 F.3d at 404. Thus, for the Court to even consider this factor, "a plaintiff challenging a prison regulation must first affirmatively argue the existence of a *specific* alternative." *Spies*, 173 F.3d at 404 (emphasis in original). Such alternative must "fully accommodate[ ] the asserted right while not imposing more than a de minimus cost to the valid penological goal." *Overton*, 539 U.S. at 136; see also *Thornburgh*, 490 U.S. at 418. If the claimant fails to point to a specific, ready alternative that fully accommodates the asserted rights at *de minimus* cost, "it would make no sense for the trial court to make a definitive ruling on the existence of 'ready alternatives.'" *Spies*, 173 F.3d at 404; *Turner*, 482 U.S. at 91. When the claimant does raise a *specific*, ready alternative that fully accommodates the asserted rights at *de minimus* cost, prison officials will nevertheless prevail on this factor if they "are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm." *Thornburgh*, 490 U.S. at 419. To this end, "administrative inconvenience . . . is also a factor to be considered." *Id.*

**Postcard Policy**: PLN asserts that the "obvious alternative to banning mail in envelopes is to inspect the contents of the envelopes in the same way the mail was inspected prior to Defendants' adoption of a 'postcard only' policy." (**Exhibit 2**, p. 14). This was precisely the alternative that the inmate in *Covell* advanced in efforts to invalidate the postcard policy, which the court found insufficient:

> It is not obvious, however, and there is no evidence, that this alternative would accommodate the right at a *de minimus* cost to the jail. . . . Nor does Plaintiff show that this alternative would not cause administrative inconvenience, a factor to be considered under the final Turner prong. . . . Plaintiff has failed to meet his burden of showing an obvious and feasible alternative. The last factor weighs in Defendant's favor.

*Id.* at 1155.

**Publications Policy:** PLN's contention that the Jail has a "blanket ban" on its materials it not supported by any evidence and, again, rests on the inaccurate presumption that the Jail's postcard policy prohibits receipt of all publications. (**Exhibit 2, p. 14**). Thus, PLN has not demonstrated that allowing unsolicited/non-subscription publications would create no more than a *de minimus* cost. Nor could it. If this Court found in PLN's favor, every inmate in Michigan would have a constitutional right to receive unsolicited/non-subscription mail. "Such a large influx of mail would have more than a *de minimis* cost on the [Jail]." *Kalasho*, 868 F. Supp. at 888 n. 1. In *Ligons*, the court found that because the prison already expended substantial resources to screen publications and prevent contraband from entering the prison, requiring mailroom staff to screen non-subscription publications would create a significant burden. 2009 Minn. App. Unpub. LEXIS 1306, at *15; see also *Kaufman*, 2007 U.S. Dist. LEXIS 45568, at *44.

Further, comparing the Jail to "2,000 detention facilities nationwide" is insufficient to demonstrate that the Jail's response is "exaggerated."

> [T]he fact that other jails and the Utah State Prison allow individual subscriptions does not automatically demonstrate that the Jail's policy is an exaggerated response. <u>Each jail has a unique population and has to formulate its own set of policies with respect to its population. The short stay of inmates is obviously a factor that Jail administrator's must factor into their policies. The Plaintiff has not demonstrated a readily available alternative that would not impact the Jail</u>. A publisher's only rule would create the same administrative constraints and be of little value to the transitory population of the Jail. Therefore, the court concludes that Plaintiff has not met its burden of proving any of the Turner factors.

*Cheshire*, 2006 U.S. Dist. LEXIS 48099, at *22-23 (emphasis added).

**B.      Insofar as PLN is Unlikely to Prevail on the Merits, the Remaining Factors of the Preliminary Injunction Standard Weigh in Defendants' Favor.**

As demonstrated above, PLN's asserted rights are not constitutionally protected and, in any event, cannot withstand the *Turner* analysis. Because PLN has failed to carry its heavy

burden of demonstrating a likelihood of success on the merits, it is "not entitled to a
presumption of irreparable harm based on the alleged constitutional claim." *Anderson*, 2011
U.S. Dist. LEXIS 57663, at *6 (addressing the second factor of the preliminary injunction
standard). Even if "limited constitutional rights" are implicated, PLN is "left to [its] proofs if [it]
is indeed entitled to a remedy. . . ." *Fisher v. Caruso*, 2007 U.S. Dist. LEXIS 11515, *9 (E.D. Mich.
Feb. 20, 2007) (attached as **Exhibit 22**).

By the same token, PLN's failure to sufficiently demonstrate any constitutional violations
tips the third and fourth factors of the preliminary injunction standard in Defendants' favor:

> **[A]bsent a sufficient showing of a violation of constitutional rights, the
> public welfare generally militates against granting extraordinary
> injunctive relief in the prison context**. . . . The operation of a prison system is
> complex and unique, and the court is mindful of its responsibility to not unduly
> interfere with legitimate penological interests that the Defendants represent.
>
> \* \* \*
>
> [T]he confidence of the public in the criminal justice depends in large part upon
> the ability of prison officials to regulate internal matters with a free hand. They
> are in a far better position than this court is to evaluate the needs of the prison
> system. . . . The potential harm to Defendants is great if the court were to decide
> to inhibit their ability to meet the challenges they face while balancing competing
> interests that include the rights of Plaintiff.

*Id.* at *6-7, 9-10 (citing *Glover v. Johnson*, 855 F.2d 277, 287 (6th Cir. 1988)) (emphasis
supplied); *see also Anderson*, 2011 U.S. Dist. LEXIS 57663 at *6 (where the plaintiff could not
demonstrate a likelihood of success on the merits, and, correspondingly, irreparable injury, this
Court found that "the interests of third parties and the public outweigh the request for a
preliminary injunction"). The arguments set forth in **Section II.A.2.**, moreover, exemplify that
issuance of a preliminary injunction, as recognized by this Court in *Fisher* and *Anderson*, would
cause substantial harm to Jail officials, inmates, and the public. PLN's failure to demonstrate
a likelihood of success on the merits is, in fact, "fatal." *Gonzales*, 225 F.3d at 625.

-33-

## CONCLUSION

For the foregoing reasons, Defendants, LIVINGSTON COUNTY and LIVINGSTON COUNTY

SHERIFF BOB BEZOTTE, respectfully request that this Honorable Court DENY Prison Legal

News' Motion for Preliminary Injunction.

/s/T. Joseph Seward
Cummings, McClorey, Davis & Acho, P.L.C.
33900 Schoolcraft Road
Livonia, MI  48150
Ph: (734) 261-2400
Primary E-mail: tjseward@cmda-law.com
P 35095

Dated: February 9, 2012

---

I hereby certify that on February 9, 2012, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: THOMAS M. LOEB, LANCE WEBER, and BRIAN PRAIN.

/s/ T. Joseph Seward
Cummings, McClorey, Davis & Acho, P.L.C.
33900 Schoolcraft Road
Livonia, MI 48150
Ph: (734) 261-2400
Primary E-mail: tjseward@cmda-law.com
P35095