# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

HUMAN RIGHTS DEFENSE CENTER,
d/b/a Prison Legal News,

        Plaintiff,

v.                                                                    Case No. 11-cv-13460
                                                                      Honorable Denise Page Hood

LIVINGSTON COUNTY SHERIFF BOB
BEZOTTE, individually and officially,
LIEUTENANT THOMAS CREMONTE,
individually and officially, and
LIVINGSTON COUNTY,

        Defendants.

_____/

## ORDER REGARDING MOTIONS FILED AS DOCKET NUMBERS 258, 261, and 274

On July 29, 2016, the parties filed Cross-Motions for Summary Judgment. [Dkt. Nos. 258, 261]  On August 19, 2016, Plaintiff filed a Motion to Strike Exhibits to Defendants' Motion for Summary Judgment [Dkt. No. 274].  All of the motions are fully briefed.   The Court held a hearing on the motions on October 6, 2016.

## I.    BACKGROUND

Plaintiff's brings, in essence, four claims in three Counts: (1) Count I - a Section 1983 action alleging violations of the First and Fourteenth Amendments; (2) Count II - a state law claim for conversion; and (3) Count III - a takings claim

pursuant to the Fifth Amendment.  A short summary of the claims of Plaintiff can be found in other court Orders, specifically the Court's two Orders dated March 29, 2013. [Dkt. Nos. 63, 64]   Most significantly, the Livingston County Jail ("Jail") has had the following policies regarding inmate mail:

A.      **Postcard Only Policy**. Beginning in October 2010, the Jail implemented a postcard only policy which required all non-publications mail to be sent on postcards.  I have been unable to find a copy of this "policy" in the record, though the essence of it is set forth in the current publications policy (set forth   below).

B.      **The Old Publications Policy.**  The mail policy for delivery of books, magazines and other materials, effective as of December 5, 2006 and in effect at the time this case was filed was:

> Inmates will be allowed to receive newspapers, magazines, and other types of publications, which are legally available to the public as long as they are mailed directly from the publisher and approved by Inmate Services.

> a)      All Cost of subscription is the inmate's responsibility.

> b)      Materials will be delivered to the inmate as long as he/she is incarcerated.

> c)      Upon release, the inmate is responsible for changing the address . . . .

> d)      Exceptions:

> > i)      Specific information regarding weapons, explosives,

2

     ii)     incendiary devices, poisons or dangerous drugs.
     ii)     Inflammatory writings advocating disorder, violence or insurrection against correctional personnel or facilities.
     iii)     Pornographic materials.
     iv)     Any instructional material in the martial arts.
     v)     Any other material that pose a safety or security risk, or interferes with the orderly operation of the jail.

[Dkt. No. 32, Pg ID 1291]

     C.    **Current Publications Policy**.  The mail policy for delivery of books, magazines and other materials changed in 2012 to provide as follows:

> MAIL – Inmates are permitted to write to any person outside of our Jail facility.  Incoming Inmate correspondence must be addressed as follows:
>
> Inmate Name, Resident
> Livingston County Jail
> . . .
>
> •   Incoming mail must reflect sender's name and address.
> •   Correspondence from attorneys, as well as court and public officials may be opened in the presence of an inmate.
> •   Mail must be sent via US Postal Service.
> •   Items NOT allowed: postage stamps, envelopes, blank stationary, jewelry, food, books, magazines, sexually explicit pictures, cash, personal or company check.
> •   All mail, except bona-fide legal mail, will be by standard post cards. This is both incoming and outgoing mail.
> •   Incoming mail deemed inappropriate may be placed in the inmate's property locker.

[Dkt. No. 25, PgID 533]

     On March 31, 2016, the Court concluded that Plaintiff was entitled to a

preliminary injunction regarding the mail policies at the Jail, insofar as the policies infringed on Plaintiff's 14th Amendment due process claim.  The Court ordered that:

> [E]ffective immediately, Defendants must, in every instance that Defendants reject (*i.e.*, do not deliver) mail sent by Plaintiff to a designated inmate at the Livingston County Jail (at least with respect to the initial copy of any publication): (a) notify Plaintiff of such rejection; (b) notify the designated inmate recipient of such rejection; and (c) notify Plaintiff and the designated inmate recipient of the right to—and afford Plaintiff and the designated inmate the opportunity to—appeal any such rejection to an impartial third party.

Dkt. No. 239, PgID 6328.  Defendants assert that they revisited their mail policies immediately after receiving the Court's March 31, 2016 Order, and they implemented changes to comply with that Order.  Plaintiff subsequently filed a motion for contempt and to enforce the preliminary injunction, arguing that Defendants' new procedures did not comport with the Court's Order.  Plaintiff's motion for contempt has been argued and remains pending.

Defendants' motion for summary judgment seeks dismissal of Plaintiff's cause of action.  Plaintiff's motion for summary judgment seeks an order from the Court that:

1. Declares: (a) Defendants' postcard-only, no magazines, no books and no due process notice or opportunity to appeal policies violated the First and Fourteenth Amendments; (b) Defendants' enforcement of those policies violated the First and Fourteenth Amendments; and (c) Defendants' censored PLN's mail in violation of the First and Fourteenth Amendments, for which Defendants must pay nominal, compensatory and punitive damages to Plaintiff;

4

2.  Enjoins Defendants from: (1) permanently rejecting or otherwise censoring mail on the ground that (a) it is not in the form of a postcard or (b) it is a magazine or book; and (2) denying due process to prisoners and their correspondents when censoring mail;

3.  Declares that: (a) Defendants unlawfully converted Plaintiff's property (i.e. its books and monthly journal) without compensation to Plaintiff, and without right or permission; (b) the conversion of Plaintiff's property was unlawful, for which Defendants must pay damages to Plaintiff;

4.  Declares that: (a) Defendants unlawfully took Plaintiff's property (i.e. its books and monthly journal); (b) maintained control and dominion over the property without Plaintiff's consent; and (c) used the property for its own benefit without just compensation to Plaintiff; and

5.  Permanently enjoins Defendants from: (a) taking, converting or otherwise exercising dominion and control over Plaintiff's property (i.e. its books and monthly journal); (b) without receiving Plaintiff's consent or permission; (c) for their own benefit or use; and (d) without just compensation or payment to Plaintiff.

## II.   ANALYSIS

## A.   Summary Judgment Standard

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is

"genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

**B.    Analysis**

As Plaintiffs' argue and Defendants acknowledge, the Court has rejected Defendants' arguments regarding protection for unsolicited literature (in the March 29, 2013 Order Granting In Part and Denying In Part Defendants' Motion for Partial Judgment on the Pleadings [Dkt. No. 64, PgID 1986-90]) and due process (in the

Court's March 31, 2016 Order Regarding Various Motions [Dkt. No. 239, PgID 6320-28]).  Defendants assert that "any order . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims." Fed.R.Civ.P. 54(b); *Patton v. U.P.S.*, 872 F.2d 1027 (1989).  Defendants ask that the Court reconsider these issues.  The Court will not reconsider those issues, as Defendants have not raised any new arguments.

    *1.    Count I (First Amendment Claim)*

The Supreme Court has identified four factors to consider when determining whether "a prison regulation impinges on inmates' constitutional rights." *Turner v. Safley*, 482 U.S. 78, 89–91(1987).The *Turner* test requires that:

> 1. there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> 2. there must be alternative means of exercising the right that remain open to prison inmates;
>
> 3. we must consider the impact that accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and
>
> 4. there must not be alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Jones v. Caruso*, 569 F.3d 258, 267 (6th Cir. 2009) (citing *Turner*, 482 U.S. at 89–91).

7

Failure to satisfy the first factor is dispositive. *Turner*, 482 U.S. at 89–90. The remaining factors must be balanced together in order to evaluate the reasonableness of the challenged regulation. *Jones*, 569 F.3d at 267. The Court will review the challenged regulation with deference to "the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh*, 490 U.S. at 408. *See also Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992).

As the Court held, Plaintiff has a constitutional right to send unsolicited mail to prisoners at the Jail, Dkt. No. 64, PgID 1986-90, and there is no need to revisit that issue here. Plaintiff challenges the postcard only policy and both of the publications policies.

### a. Valid Rational Connection to Legitimate Penological Interests

Defendants assert that there are two legitimate penological interests behind their postcard only and publications policies:[1] (1) safety and security; and (2) the efficient

---

[1]Defendants suggest that Plaintiff's arguments regarding PYHS and informational brochures are misplaced because PYHS was not published by Plaintiff and the informational brochures are not publications. These arguments lack merit. First, there is no requirement that a "publication" has to be published by the party sending it to the inmate. *Bell v. Wolfish*, 441 U.S. 520, 550 (1979) (the "prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores does not violate the First Amendment rights of . . . inmates"); *Ward*, 881 F.2d at 326 ("Defendants . . . permitted inmates to receive newspapers, magazines, and books from publishers or book clubs only").

8

use of resources.  As noted by the Sixth Circuit, the right to receive mail from an outside source "is subject to restriction in the interests of prison security, but such restriction must further legitimate penological objectives, in a manner no more restrictive than necessary." *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985). And, although the *Turner* standard affords deference to correction officials, *Thornburgh*, 490 U.S. at 408, *Turner's* "reasonableness standard is not toothless," *Beard v. Banks*, 548 U.S. 521, 535 (2006) (citing *Thornburgh*, 490 U.S. at 414), and does not grant a "blank check to prison officials." *Johnson v. California*, 543 U.S. 499, 547 (2005).

The Court finds that both of the penological interests asserted by Defendant are legitimate. *See, e.g., Jones v. Campbell*, 23 F. App'x 458, 462 (6th Cir. 2001) (reducing burden on staff who processes the mail is a legitimate government interest); *Perez v. Oakland Cnty*., 466 F.3d 416, 431 (6th Cir. 2006); *United States v. Collins*, 683 F.3d 697, 704 (6th Cir. 2012); *Thornburgh*, 490 U.S. at 415 (maintaining institutional security and order is a legitimate penological interest); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (same); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (same).  Plaintiff does not seem to dispute that the interests asserted by

---

Second, if an informational brochure is not be a publication, it would fall within the category of enveloped mail.  Either way, the informational brochures are barred by the Jail's mail policies.

Defendant are legitimate penological interests.  Plaintiff instead argues that there is an absence of a valid, rational connection between the regulations and the legitimate governmental interests asserted by Defendants.[2]

Defendants argue, and evidence supports their position, that deputies (and not simply clerical staff) had to assist in processing mail, which took the deputies from their "primary duties of ensuring a safe and secure Jail."  According to Sgt. Terrance Edward Davis, deputies processed the mail on the night shift for at least a year, Dkt. No. 258, PgID 6951, and had to perform the mail screening while continuing to perform their other duties. *Id.* at 6963-64. Defendant Cremonte previously filed an affidavit averring that the time for Jail staff to process mail went from an 8-hour day, with assistance from deputies, to a 4-hour day after implementation of the postcard only policy. Dkt. No. 32, PgID 1300, ¶¶ 10-11, Dkt. No. 258, Ex. 1 at 173-74.  There is also evidence that before the postcard only policy, one of the 7 full-time civilians (at least at times) processed the mail for 8 hours, but after the postcard only policy was implemented, one of the 3 full-time civilians and 4 part-time civilians processed the

---

[2]The postcard only policy was adopted in October 2010, before Plaintiff began sending its materials to inmates at the Jail, such that the policy was the result of the heavy volume of mail received even before Plaintiff began sending mail to Jail inmates.  Prior to enacting the postcard only policy, Jail employees searched for other postcard only policies, Dkt. No. 262, Ex. 34 at 65; Ex. 38 at 42-43, and contacted staff persons at another jail that has a postcard only policy. Dkt. No. 262, Ex. 38 at 58.

mail in 4 hours. Dkt. No. 258, Ex. 1 at 173-74.

Plaintiff argues that the postcard only policy was irrational, as jails across the country permit enveloped mail, just as the Jail did so prior to implementation of the postcard only policy.  Plaintiff cites a plethora of Ninth Circuit cases to support its position, as well as a Seventh Circuit case and 10th Circuit case.  Plaintiff also relies on a similar case involving the Macomb County Jail. *Prison Legal News v. Macomb Cnty., Mich.*, No. 15-12350, Dkt. No. 49, June 17, 2016 (Stipulated Injunction).  In that case, Plaintiff recently obtained much of the relief it seeks here (namely, the elimination of a postcard only policy), but that resolution was the result of a stipulated settlement, not a determination by the court and the case remains open.

The rationale adopted by Federal courts in striking down postcard-only policies is clear – letters facilitate the exchange of views on: (a) poor jail conditions and how to alleviate them, (b) legal rights, and (c) how to address private medical, psychological and educational needs, among other things. The Urban Institute's Justice Policy Center noted the link between public safety and reading:

> Research demonstrates that education can change thinking, encourage pro-social behavior, increase employment, and reduce recidivism. Education's power to transform lives in both tangible and intangible ways makes it one of the most valuable and effective tools we may have for helping people rebuild their lives after incarceration, as well as for combating crime and reducing criminal justice costs.

Dkt. No. 261, PgID 7482 (citing *From the Classroom to the Community: Exploring*

11

*the Role of Education During Incarceration and Reentry* (2009)).  The American Bar Association has underscored the importance of mail to prisoners noting that "[m]ail is a crucial method by which prisoners maintain and build familial and community ties."  ABA Standards for Criminal Justice: Third Edition, "Treatment of Prisoners" Standard 23-8.6 at 265.[3]  The national detention standards for U.S. Immigration and Customs Enforcement facilities state that "[f]acilities shall not limit detainees to postcards and shall allow envelope mailings."  ICE Performance-Based National Detention Standards 2011.[4]  Finally, the Supreme Court has recognized that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." *Procunier v. Martinez,* 416 U.S. 396, 412–13 (1974).

As to safety and security, Defendants contend that the postcard only policy is necessary and reasonably related to ensuring safety and security.  Defendants rely on a district court case from Florida, where the court stated:

> Sealed envelopes provide a greater opportunity for the introduction of drugs and weapons into jail facilities than postcards because envelopes can contain multiple pages of paper with folds and creases that lend themselves to smuggling contraband. Postcards have no folds or creases.

---

[3]http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html.

[4]https://www.ice.gov/detention-standards/2011

12

> Even if a jail staffer has to remove the stamp from a postcard to make sure no contraband lies beneath, that effort pales in comparison to the effort necessary to inspect a sealed letter or a pop-up greeting card thoroughly.
>
> * * * * *
>
> Plaintiff argues that the . . . policy cannot rationally be connected to reducing the introduction of contraband for security purposes if the policy does not completely eliminate the problem. The Court rejects Plaintiff's argument because it is rational for the Sheriff's Office to . . . implement policies and procedures which reduce the amount of contraband entering its facilities, even if the policies and procedures will not eliminate the problem completely.

*Althouse v. Palm Beach Cnty. Sheriff's Office*, No. 12-80135, 2013 WL 536072, at *5

(S.D. Fla. Feb. 12, 2013).

Plaintiff contends that Defendants' rationale for the postcard only ban rationale is "purely imagined." Plaintiff argues that Defendants have failed to show there is any actual danger to support their assertion that the postcard only policy is necessary and reasonable. Plaintiff asserts that Defendants have "no credible evidence that the Jail experienced any threat to penological interests as a consequence of allowing prisoners to have books, letters or magazines." Dkt. No. 261, PgID 7483. As Plaintiff asserts, records from the Jail from 2009 to January 2016, as well as the 1 year and 10 month period prior to the postcard only policy and the three years prior to the blanket publication ban, show little, if any, actual or contraband or threat. Plaintiff suggests that "*Turner* requires more than just a belief in some speculative threat at some future

13

date," Dkt. No. 286, PgID 8459, but it does not cite specifically to any authority that requires a showing of "actual danger."

Plaintiff cites a district court case from California that compared a postcard only policy with the prior policy of subjecting incoming mail to a routine, industry-standard inspection. *See Prison Legal News v. County of Ventura*, 2014 WL 2736103 (C.D. Cal. 2014). The *Ventura* court found the "rational relationship between the postcard-only policy and enhancing security dissolves," stating that:

> Given that contraband can be interdicted by inspecting all incoming mail, the connection between the postcard-only policy and the County's goal of reducing contraband is tenuous at best. While the postcard-only policy may theoretically reduce the risk of contraband entering the jail—simply because envelopes offer more creases and folds for smuggling, and no inspection system is foolproof—this mere theoretical possibility is insufficient to rebut [the plaintiff's] evidence that letter mail does not pose a legitimate security threat. Absent any evidence that affirmatively shows that the postcard-only policy enhances jail security, we conclude the postcard-only policy smacks of arbitrariness and irrationality.

*Id.* at **4-5.

Defendant counters that they need not show actual danger to support the reasonableness of the challenged regulation, as a showing that a potential danger exists is sufficient. *Brown v. Johnson*, 743 F.2d 408, 413 (6th Cir. 1984). *See also Thompson v. Campbell*, 81 F. App'x 563, 567 (6th Cir. 2003) (citing *Thornburgh*, 490 U.S. at 417) (the issue is "not whether the prohibited materials have in fact caused problems or even 'likely' to cause problems, but whether a reasonable official might

14

think that the policy advances those interests"). *See also Prison Legal News v. Chesire*, No. 04-173, 2006 WL 1868307, at **5-8 (D. Utah June 30, 2006).

With respect to the old publications policy, Defendants argue that distributing unsolicited publications required that Jail staff sort and process a burdensome influx of incoming mail. Relying on *Kaufman v. Karlen*, No. 06-205, 2007 WL 1821098, *15 (W.D. Wis. June 21, 2008), aff'd, 270 Fed. Appx. 442 (7th Cir. 2008) (finding that a policy prohibiting free publications in order to reduce mail volume was rationally related to governmental interest). Defendants suggest that influx of incoming unsolicited mail created opportunities to smuggle contraband into the Jail and that inmates would accumulate excessive amounts of property in their cells, increasing opportunities to conceal smuggled contraband. Relying on *Ligons*, 2009 WL 4796150, at *3 (finding that a subscription-only policy designed to promote security and lessen the administrative burden furthered a legitimate governmental interest).

Defendants' argument is undermined by the Jail policy of allowing inmates to subscribe to an unspecified number of daily local newspapers, Dkt. No. 262, Ex. 39 at 37-38, which allows an accumulation of paper in cells much greater than a weekly or monthly magazine. Plaintiff also has presented evidence that Defendants did not enforce their publication policy that limited prisoners to two books.

15

As to the current publications policy that completely bans publications, Defendants cite several recent cases where the court has upheld a ban on the receipt of publications by inmates. *Hause v. Vaught*, 993 F.2d 1079, 1084 (4th Cir. 1993); *Prison Legal News v. Chesire*, No. 04-173, 2006 WL 1868307, at **5-8 (D. Utah June 30, 2006); *Black v. Camon*, No. 06-75, 2010 WL 890159, at **2-4 (M.D. Ga. March 9, 2010). Defendants assert that the policies should be upheld because they are content-neutral—the restrictions were made and are enforced "without regard to the content of the expression," *Thornburgh*, 490 U.S. at 415, and were adopted to combat the aforementioned safety and security concerns, as well as Jail personnel overwhelmed by the volume of incoming publications.

Defendants argue that their policies are neutral because they limit the method of communication without limiting the substance or suppressing expression because they apply to all non-"legal mail" correspondence. Citing *Covell*, 662 F.Supp.2d at 1153. The Court agrees that the policies are neutral, as they apply to all persons. As the Court previously noted, there is evidence that the postcard only policy may not have been content-neutral as it relates to Plaintiff (when Defendant Cremonte failed to deliver a number of postcards sent by Plaintiff that were addressed to individuals).

Defendants argue that they have presented evidence that the publications posed serious security threats, as publications can be used to smuggle contraband into the

16

Jail and conceal contraband inside the Jail. Defendants again argue that actual documented problems are not necessary, as potential danger is sufficient to support the reasonableness of a policy. Citing *Chesire*, 2006 WL 1868307, at **5-6.

As to actual threats or contraband, the evidence seems to show the following. Defendants have produced no evidence of drugs being smuggled through the mail prior to 2009 and only two situations involving drugs since then, though there is no indication those two situations involved use of the mail. Dkt. No. 262, Ex. 29 (Incident Report Nos. 13-0218, 15-0984). Three incidents involving weapons and a book, magazine or an envelope have been reported since 2013, after the implementation of the publication ban and postcard only policy. Dkt. No. 262, Ex. 29 (Incident Report Nos. 13-0266, 13-0848, and 14-0237); Ex. 39 at 32. No incident reports were produced identifying threats, inappropriate advertisements, or solicitations through letters, books, or magazines have been made, but there were some documents produced indicating letters, books, or magazines were used for escape plans. Dkt. No. 262, Ex. 29 (Incident Report No. 10-02942); Ex. 26; and Ex. 30. There is no evidence that letters, books, or magazines were used to cover cell doors or windows, nor that they were used to start fires or jam locks. Defendant Cremonte testified that there were at least two murder for hire plots identified in the mail and one threat to kill a detective. Dkt. No. 262, Ex. 34 at 145-46.

Defendants identify several ways in which the mail policies would improve jail security, including: (a) reducing mail processing time, which allows deputies to be engaged in normal duties related to securing the Jail; (b) reducing incidents where inmates flush materials down the toilet; and (c) reducing or making less likely that contraband or dangerous materials/plans will enter the Jail through the mails. Defendants concede that contraband has been received in the Jail, even after the mail policies were implemented, but contend those breaches do not undermine the rational connection of the postcard policy to its legitimate penological goals. *Covell v. Arpaio*, 662 F.Supp.2d 1146, 1153 (D. Ariz. 2009)(instances of contraband entering the jail after implementation of the policy were "not sufficient to show that the policy lacks a rational connection to a legitimate penological goal").

The Court finds that there are genuine disputes of material facts regarding whether the legitimate penological interests asserted by Defendants are rationally connected to the Defendants' policies. The parties present conflicting evidence and interpretations of the number of prisoners at the Jail during the relevant periods, as well as the average length of incarceration. The issue is complicated due to expansion of the Jail during the relevant periods. There is a genuine dispute of material fact as to the burden on Jail personnel to process mail with respect to volume of mail coming in (as all incoming mail, not simply Plaintiff's, is subject to Defendants' mail policies)

18

and how long processing such mail takes under the policies—and how long it would take without the policies.

As noted above, there also is a genuine dispute of material fact regarding the number of contraband and security threat incidents that have occurred at the Jail. Plaintiff argues that Defendants' basis for the postcard only policy was that, according to Defendant Cremonte, there were "a couple dozen incidents of contraband entering the facility over an 11 year period." Dkt. No. 262, Ex. 34 at 158-59. Defendants argue that Plaintiff's reading of Defendant Cremonte's deposition was erroneous, as what Defendant Cremonte actually was responding to was the period between January 2010 and when the postcard only policy was implemented in October, 2010. Dkt. No. 285, PgID 8364-65. The parties' argument centers on the following deposition testimony of Defendant Cremonte:

> Q.   As to [the number of incidents in which mail contained contraband] that violate[s] state law . . . you can't really give me a figure for 2010 up through the postcard policy . . . ?
>
> A.   No.
>
> Q.   You can't give me a figure whether it is 10, whether it's 100, whether it's 200?
>
> A.   Two dozen times or so.

Dkt. No. 258, PgID 6797.

The Court finds that neither party has demonstrated the absence of a genuine

19

dispute of material fact regarding whether the penological interests asserted by Defendants are rationally related to the postcard only and publication policies.

### b.  Reasonable Alternative Means of Communication

The parties have submitted conflicting evidence regarding whether there are any reasonable alternative means by which outside parties (such as Plaintiff) can communicate with prisoners at the Jail.  Defendants argue that Plaintiff can communicate with inmates through postcards, telephone calls, in person visits, and by donating publications to the Jail library.[5]  Defendants recognize that such alternatives may not be ideal, but states that the alternatives "need not be ideal; . . . they need only be available." *Overton*, 539 U.S. at 135.  At least several courts have agreed with Defendants' arguments. *See, e.g., Covell*, 662 F.Supp.2d at 1154.[6]

Defendants argue that the old publications policy allowed inmates to receive

_____

[5]Based on the briefs, it is unclear whether there is one Jail library or if there is a "law library" where only online resources are available (Plaintiff argues the "law library" consists of this) plus a library with hard copies of items (Defendants seem to suggest such a library exists).

[6]*See also Prison Legal News v. Chapman*, 44 F. Supp. 3d 1289, 1300 (M.D. Ga. 2014); *Perkins v. Demeyo*, No. 12-01242, 2014 WL 5782769, at *6 (D. Nev. Nov. 6, 2014); *Althouse*, 2013 WL 536072, at *5; *Daniels v. Harris*, No. 11-45, 2012 WL 3901646, at *6 (M.D. Ga. Aug. 8, 2012), report and recommendation adopted in *Daniels v. Harris*, No. 11-45, 2012 WL 3901644 (M.D. Ga. Sept. 7, 2012); *Gamble v. Arpaio*, No. 12-0790, 2013 WL 5890730, at *5 (D. Ariz. Nov. 4, 2013).

publications to which they subscribed and to have access to publications, including Plaintiff's, in the Jail library, where Plaintiff can donate its publications. Citing *Ligons*, 2009 WL 4796150, at *4; *Kalasho*, 868 F.Supp. at 887; *Kaufman*, 2007 WL 1821098, at *16 (because "free material may be donated to the prison library where it will be shelved," prisoners had "alternate means of . . . acquiring information that might otherwise be denied under the policy banning free material"). Defendants argue that "worn" materials include the same information and that Plaintiff could send postcards alerting prisoners to find those materials in the Jail library.

Defendants suggest that the Jail library, which contains many publications (including Plaintiffs) provides a sufficient alternative for inmates. Defendants argue that, if Plaintiff wants to communicate directly with inmates to be sure they know Plaintiff's materials are available, Plaintiff could send postcards to inmates, which would make the inmates aware of the publications in the Jail library.

Plaintiff counters that there are no reasonable alternative means at the Jail for it to communicate with prisoners at the Jail. First, Plaintiff asserts that the Jail's "law library" does not have any hard copy publications from Plaintiff, only terminals for prisoners to do legal research (which does not include Plaintiff's publications). Second, Plaintiff contends that the library cart that goes around to prisoners once a week (on Sunday) is not a reasonable alternative because the books on the cart "are

very worn" and are not always returned.  Third, Plaintiff states that while one of its books may have been on the library cart, the monthly journal (*Prison Legal News*) and some of its other books are not, so Plaintiff's information is not available to prisoners at the Jail.  Plaintiff notes that another district court has concluded that, based on access restrictions for inmates, "the library is not a sufficient alternative means to exercise the inmate's right to receive information." *Prison Legal News v. Werholtz*, No. 01-4054, 2007 U.S. Dist. LEXIS 73629, at *7 (D. Kan. 2007).   F o u r t h , Plaintiff states that only video visitation is allowed at the jail, not contact visitation. Fifth, Plaintiff argues that the cost of phone calls from the Jail is expensive and prohibitive.  Sixth, Plaintiff asserts that it cannot communicate by postcards because the content of its materials (presently communicated in brochures, letters, and publications) will not fit on a postcard.

Plaintiff relies on a Ninth Circuit case for the proposition that "[c]ourts have rejected mail policies requiring speech to be communicated in a particular medium." *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001).  Plaintiff states that, while the Sixth Circuit has upheld policies limiting periodicals only to those sent by publishers, it has not banned any particular medium, as Defendants' policies do. *Ward v. Washtenaw Cnty. Sheriff's Dep't*, 881 F.2d 325, 330 (6th Cir. 1989); *Brooks*, 779 F.2d at 1180-81 (prison officials cannot withhold personal subscription publications, noting that "[l]ike

personal correspondence, a subscription represents the exercise of volition by both sender and recipient.").  Notably, there are no subscriptions at issue in this case - only unsolicited items sent by Plaintiff to prisoners at the Jail, though the Court has ruled that unsolicited communications are protected the same as subscriptions.  Defendants respond that "[i]t appears . . . that a simple postcard could be used across the country to alert inmates to Plaintiff's existence and available materials."  This argument is undermined by Defendants' refusal (at least in September 2011) to deliver 30 postcards because Defendant Cremonte considered it a "mass mailing." Dkt. No. 258, PgID 6592.

The Court finds that there is a genuine dispute of material fact regarding alternative means of communication.

### c. Effect of Accommodation

Plaintiff argues that the third *Turner* factor favors Plaintiff.  The Supreme Court has stated that "the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction." *Procunier*, 416 U.S. at 414 n.14.  Plaintiff argues that there are over 2,600 penal institutions, including death row and maximum security prisons, that permit the distribution and delivery of mail from Plaintiff.  Plaintiff contends that the Jail should be capable of, and should have to allow, the same, without the restrictive mail policies Defendants seek to continue.

Defendants counter that, prior to the implementation of the postcard only policy, staff at the Jail expended significantly more resources processing mail to inmates and that deputies were part of the staff who had to help process mail, which diverted their attention from "important duties and assignments within the Jail." Defendants argue that contraband was a serious problem and presented a significant risk. A return to allowing publications and enveloped mail, Defendants argue, would require a "significant reallocation of the Jail's limited financial resources, impair the ability of deputies to ensure a safe and secure Jail, and reopen opportunities for inmates and outsiders to smuggle contraband into the Jail." Citing *Overton*, 539 U.S. at 135; *Thornburgh*, 490 U.S. at 418; *Turner*, 482 U.S. at 90. Defendants assert that this "ripple effect" is "sufficient to tip the third factor" in Defendants' favor. *Covell*, 662 F.Supp.2d at 1154. Defendants argue that the fact that other facilities are able to distribute materials is both: (a) irrelevant to the circumstances that exist at the Jail; and (b) offset by the fact that numerous courts have upheld a postcard only policy.

Defendants argue that Plaintiff views the issue of sending publications too narrowly. Defendants contend that Plaintiff considers only the materials it sends and ignores the fact that other publishers, bookstores, etc. are sending publications, which results in a voluminous influx of mail that imposes an undue burden on Jail staff.

24

Defendants contend that, because the average length of incarceration (16-17 days) is not long enough for a subscription to begin, the Jail policy was rational, as accommodating non-subscriptions "would be an inefficient and inappropriate allocation of Jail resources." Relying on *Ligons*, 2009 WL 4796150, at *5; *Kaufman*, 2007 WL 1821098, at *16. Plaintiff counters that "[a]t least 41% of the prisoners incarcerated at the Jail [from January 2011 to September 2011] were there for more than 60 days and would be able to receive ongoing subscriptions." Dkt. No. 262, Ex. 25. Defendants contend that the effect of allowing publications into the Jail places a significant strain on the Jail's resources and personnel, as all publishers, not just Plaintiff, would have to be accommodated because the policies are content-neutral and apply to all persons, not simply Plaintiff.

Plaintiff argues that, to the extent Defendants claim that the policies were to cut costs, the savings attributable to implementation of the policies is "too modest." Plaintiff contends that Defendants are not even able to identify the costs saved due to the policies, especially as the evidence shows that Defendants' claim that the prisoner population is at the Jail on average of 16-17 days.

There appears to be a genuine dispute of material fact on this issue, one that will require the factfinder to evaluate the facts and how they impact Plaintiff, inmates, and the Jail and its operations.

### d.    Ready Alternatives/Exaggerated Response

The Court must consider the existence of obvious and easy alternatives as indicative of an exaggerated response by prison officials. *Turner*, 482 U.S. at 90–91. "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.*

Plaintiff argues that the postcard only policy is an "exaggerated response" to concerns at the Jail, and that a return to inspecting mail in envelopes would be reasonable, as evidenced by the more than 2,600 correctional facilities nationwide, including the Federal Bureau of Prisons, that allow enveloped mail, books, and magazines and accept Plaintiff's materials. Citing *Columbia County*, 942 F.Supp.2d at 1075; *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (holding that widespread distribution of publisher's materials suggests that mail bans may be an exaggerated response).  Plaintiff contends that this alternative "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests," which the "court may consider . . . as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91.  Plaintiff contends that Jail staff can, together with random searches of cells, inmates, and accumulated paper, detect and intercept contraband in the following ways: visual and physical inspection, the use of

26

x-ray machines, and drug or metal detectors.

Defendants contend that the postcard only policy is not an exaggerated response to their concerns, based on both cost and security factors that existed prior to—and were the reasons for—the adoption of the postcard only policy. *Chapman*, 44 F.Supp.3d at 1301 (jail staff "would still have to open, inspect, and monitor sealed envelopes with multi-page letters—the same concerns the postcard-only policy was meant to address"); *Althouse*, 2013 WL 536072, at *6. Defendant suggests that utilizing the alternative proposed by Plaintiff would result in "the same problems the postcard only policy was designed to eliminate," so it is "not an obvious and feasible alternative to [Defendants'] postcard only policy." *Althouse*, 2013 WL 536072, at *6. Defendants argue that Plaintiff, who has the burden to do so, has not demonstrated that its proposed "alternative would accommodate the right at a *de minimis* cost to the [J]ail." *Covell*, 662 F.Supp.2d at 1155; *Althouse*, 2013 WL 536072, at *5 (the effort necessary to screen a postcard "pales in comparison to the effort necessary to inspect a sealed letter").

Defendants assert that Plaintiff's alternative of allowing its unsolicited literature is unworkable because Defendants cannot make an exception just for Plaintiff and allowing everyone to do so would have more than a *de minimis* cost on the Jail. Citing *Kalasho*, 868 F.Supp. at 888 n.1. Defendants contend that, because Plaintiff

does not "suggest a simple and effective means of addressing the concerns" regarding the volume of mail, the fourth *Turner* factor weighs in favor of upholding the policy. *Kaufman*, 2007 WL 1821098, at *16.

Finally, Defendants assert that Plaintiff has not met its burden of identifying an alternative that is not burdensome to Defendants. Relying on *Overton*, 539 U.S. at 132; *Shaw*, 532 U.S. at 232. Defendants contend that the fact that "2,600 correctional facilities nationwide" can process publications is irrelevant to demonstrate that Defendants' publication policy is an "exaggerated response." *Chesire*, 2006 WL 1868307, at *8 (each jail's unique population and administrative constraints have to be considered). "The Constitution does not mandate a lowest common denominator security standard, whereby a practice permitted at one penal institution must be permitted at all institutions." *Turner*, 482 U.S. at 93 (citing *Campbell*, 441 U.S. at 554) (internal citations omitted).

Defendant concludes, and the Court finds, that there is a genuine dispute of material fact precluding the Court from "mak[ing] a definitive ruling on the existence of 'ready alternatives'" at this stage of the proceedings. *Spies v. Voinovich*, 173 F.3d 398, 404 (6th Cir. 1999).

     **e.**    **Conclusion**

The Court finds that a genuine dispute of material fact regarding Plaintiff's First

Amendment claim as it relates to the postcard only policy and both of the publications policies.

### f.   Qualified Immunity

Defendants assert that Defendant Bezotte and Defendant Cremonte are entitled to qualified immunity with respect to Plaintiff's First Amendment claims.  For the reasons that follow, the Court dismisses Plaintiff's First Amendment claim against Defendant Bezotte and Defendant Cremonte in their individual capacities on the basis of qualified immunity.

Plaintiff bears the burden of demonstrating that Defendant Bezotte and Defendant Cremonte are not entitled to qualified immunity. *See, e.g., Livermore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). Plaintiff must show that Defendant Bezotte and Defendant Cremonte knowingly violated the Constitution or displayed plain incompetence. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013).  Generally, only case law from the Sixth Circuit or the Supreme Court can clearly establish the existence of constitutional rights. *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 153-54 (6th Cir. 2013).  Plaintiff does not respond to Defendants' arguments regarding qualified immunity.

First, Plaintiff has not demonstrated that there is, and the Court finds that there is not, any clearly established law regarding postcard policies.  Neither the Sixth

Circuit nor the United States Supreme Court have ruled on the issue, and as Defendants state, several courts have upheld postcard policies after conducting analysis under *Turner. See, e.g., Covell v. Arpaio*, 662 F.Supp.2d 1146, 1153-55 (D. Ariz. 2009).[7] Likewise, courts have routinely granted qualified immunity because the constitutionality of a postcard only policy remains unsettled. *See, e.g., Daniels*, 2012 WL 3901646, at *4; *Salam v. Delaney*, No. 12-01040, 2014 WL 4961185, at *11 (W.D. Ark. Sept. 30, 2014); *Rucker v. Gilmore*, No. 13-03028, 2015 WL 506210, at **5-6 (D. Kan. Feb. 6, 2015); *Brown v. Hickman*, No. 12-03150, 2015 WL 1097392, at *9 (W.D. Ark. March 11, 2015); *Pergande v. Trumbo*, No. 10-6314, 2013 WL 4083337, at **1-2 (D. Or. Aug. 7, 2013).

Second, there is no clear precedent from the Sixth Circuit or the United States Supreme Court with respect to either of the Jail's publication policies. Decisions in which other courts evaluated similar publication policies do not "point unmistakably to the unconstitutionality of the conduct complained of," nor are they "so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be

---

[7]*See also Barnes v. Wilson*, 110 F. Supp. 3d 624, 632-33 (D. Md. 2015); *Chapman*, 44 F. Supp. 3d at 1299-1301; *Perkins*, 2014 WL 5782769 at **5-7; *Althouse* 2013 WL 536072 at **4-6; *Daniels*, 2012 WL 3901646 at **5-6; *Gamble*, 2013 WL 5890730 at **4-5; *Gieck*, 2008 WL 2604919 at **4-7; *Gambuzza v. Parmenter*, No. 09-1891, 2010 WL 2179029, at *3 (M.D. Fla. May 28, 2010) (citing *Covell* and three other cases in which courts upheld the postcard only policy under *Turner*'s "reasonableness" test).

found wanting." *Virgili v. Gilbert*, 272 F.3d 391, 393 (6th Cir. 2001). In fact, some courts have upheld similar publication policies. Even in *Chapman*, where the court found that a publication ban violated the First Amendment, the court granted qualified immunity. *Chapman*, 44 F.Supp.3d at 1306-07.

Third, Plaintiff must establish that Defendant Bezotte was personally involved in the censorship of Plaintiff's postcards in order to establish liability against him. *Heyerman v. Calhoun Cnty.*, 680 F.3d 642, 647 (6th Cir. 2012); *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). Based on uncontroverted evidence, Defendant Bezotte did not know that Jail staff censored Plaintiff's postcards. (Dkt. No. 258, Ex. 2 at 47-48). Plaintiff has not established personal involvement by Defendant Bezotte, and the Court finds that he is entitled to qualified immunity with regard to the postcards.

As to Defendant Cremonte, Defendants argue that no precedent from the Sixth Circuit or the Supreme Court clearly establishes that non-delivery of mass mailings is unconstitutional, and courts in the Sixth Circuit have upheld policies or practices that prohibit receipt of bulk mail. *Sheets*, 97 F.3d at 168-69; *Kalasho*, 868 F. Supp. at 887-88; *Jones*, 23 F. App'x. at 461-64; *Thompson*, 81 F. App'x. at 569-70. Moreover, the Sixth Circuit has acknowledged a distinction between personal correspondence, which "represents the exercise of volition by both sender and recipient," and mass

mailings. *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985). Based on the aforementioned decisions, an official in Defendant Cremonte's position could have reasonably concluded that non-delivery of mass mailings was constitutional. *See Sheets*, 97 F.3d at 166-68. The Court finds that Defendant Cremonte is entitled to qualified immunity regarding the postcards because there appears to be a genuine dispute of material fact whether the postcards delivered to the Jail in September 2011 (and perhaps on other occasions) constituted a "mass mailing."

2.    *Count I (Fourteenth Amendment Claim)*

The Court has ruled in Plaintiff's favor on this issue on its motion for preliminary injunction, finding that Plaintiff is likely to succeed on its claim that Defendants denied Plaintiff due process when censoring mail sent by Plaintiff to inmates. For that reason, the Court granted Plaintiff's motion for preliminary injunction and required Defendant to provide to Plaintiff and the designated recipient inmate: (a) notice of any rejection of mail (at least with the first copy of any publication), and (b) the right to appeal that rejection, and (c) the right to have the appeal decided by "an impartial third party." Plaintiff argues that the Court should: (1) declare that Defendants violated Plaintiff's Fourteenth Amendment rights with respect to all books, magazines, and enveloped mail sent to the Jail, and (2) convert the preliminary injunction to a permanent injunction.

Defendants argue that they should not have to provide notice and the right to appeal for each piece of mail, as different considerations exist when there are mass mailings. *Procunier*, 416 U.S. at 408 n.11, 417 (the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards," but "different considerations may come into play in the case of mass mailings"); *Perry v. Fla. Dep't of Corr.*, 664 F.3d 1359, 1368 (11th Cir. 2011) ("mass mailings require a lower standard for due process guidelines). As set forth in *Perry,* a court must consider three factors when evaluating a due process claim:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Perry*, 664 F.3d at 1368 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Defendants argue that Plaintiff does not have a compelling private interest in ensuring that its unsolicited publications reach inmates when compared to Defendants' important interest in maintaining institutional security and order. Defendants also argue that Plaintiff had notice of why its books and magazines would not be delivered to inmates—because the policies are on the website and Plaintiff filed suit based on the policies. Defendants also note that Plaintiff never contacted the Jail to protest the policy or rejection of Plaintiff's literature. Defendants state that, since the Court

issued the preliminary injunction, they have implemented new procedures, complied with the Court's directives, and no due process violations have occurred. The Court previously denied a motion for contempt and sanctions filed by Plaintiff regarding Defendants' compliance with the Court's preliminary injunction order.

The Court concludes that, notwithstanding the issuance of the preliminary injunction, there remains a genuine dispute of material fact regarding Plaintiff's Fourteen Amendment due process claim. The Court declines Plaintiff's invitation to: (1) declare that Defendants violated Plaintiff's Fourteenth Amendment rights with respect to all books, magazines, and enveloped mail sent to the Jail, and (2) convert the preliminary injunction to a permanent injunction

### 3.    *Count II - Conversion Claim*

Plaintiff alleges that Defendants took custody of certain copies of Plaintiff's publications (specfically, *Prison Legal News* and *Protecting Your Health & Safety*) and, for "their own use," placed the publications in the Jail library, without either: (a) giving notice to, or obtaining consent from, Plaintiff; or (b) ordering any of the books or a monthly subscription for *Prison Legal News*. Because Defendants did not compensate Plaintiff for use of its publications at the Jail, Plaintiff asserts it is entitled to judgment on its conversion claim. Plaintiff does not specify whether it is pleading a statutory or common law conversion claim. M.C.L. 600.2919a(1)(a) provides:

34

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees: (a) Another person's stealing or embezzling property or converting property to the other person's use.

Defendants argue that they cannot be liable for statutory conversion because Plaintiff has not shown that any of the magazines or books were converted to Defendants' use. Defendants contend that the magazines and books were placed in the Jail library for the use and benefit of inmates. Citing *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 497 Mich. 337, 340, 358-59, 361 (2015). Plaintiff does not respond to this argument.

Defendants' argument is persuasive. The Jail was not obligated to have any of the publications in any of its libraries, so by "taking" those publications and putting them in the Jail library, Defendants were not saving money. There is no evidence that the Jail or any of the Defendants derive any benefit from the content of the publications or having the publications at the Jail; rather, having the publications in the library was solely for the benefit of the very inmates Plaintiff was trying to reach (and, arguably, for the benefit of Plaintiff). As there is no evidence that the Jail or any of the Defendants converted the property to their own use, Defendants' motion for summary judgment is granted on Count II.

Defendants contend that Plaintiff also does not have a viable common law conversion claim because the publications sent by Plaintiff were gifts to the inmates,

35

such that Plaintiff lacks an interest in the publications.  Defendants' argument is misplaced, as the "gifts" were never accepted by the inmates—because the inmates were not aware of, and could not have accepted, them. *See Davidson v. Bubbee*, 227 Mich.App. 264, 268 (1997) (citing *Molenda v. Simonson*, 307 Mich. 139, 141-42 (1943)) ("In order for a gift to be valid, three elements must be satisfied: [including that] . . . (3) the donee must accept the gift.").

Defendants assert that a claim for conversion cannot survive absent a reasonable attempt to recover the property. *Gum v. Fitzgerald*, 80 Mich.App. 234, 239 (1977) ("Plaintiffs are required to show that a reasonable attempt has been made to recover their property in order to establish that their right to possession has been refused"). It is undisputed that there is no allegation or evidence that Plaintiff made any attempt to recover the property, and summary judgment on Count II also is appropriate for this reason. *See Frank Turner Ministries, Inc. v. Bank of America*, No. 298967, 2011 WL 5008615, at *2 (Mich.Ct.App. Oct. 20, 2011) (holding that because "plaintiffs presented no evidence to indicate that they demanded return of the property," the circuit court "properly granted summary disposition in favor of defendants, terminated the preliminary injunction regarding the property, and dismissed the complaint").

### 4.   *Count III - 5th Amendment Takings Claim*

In its motion for summary judgment, Plaintiff's entire argument consists of

directing the Court to its (one paragraph) argument regarding conversion.   As individuals, Defendant Bezotte and Defendant Cremonte are not governmental entities who could exercise the power of eminent domain/taking. *Vicory v. Walton*, 730 F.2d 466, 367-68 (6th Cir. 1984).  Count III is dismissed against them in their individual capacities as a matter of law.

Procedurally, a takings claim requires that: (1) the state provide an adequate procedure for redressing a taking; (2) the plaintiff has availed itself of the procedure in state court; and (3) the plaintiff has been denied just compensation. *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 569 (6th Cir. 2008).  Defendants argue Plaintiff's takings claim is not ripe for review because Plaintiff does not allege or offer evidence that: (a) Plaintiff's publications were appropriated for public use (Defendants argue they were placed in a Jail library, in the Jail's administrative offices, or turned over to legal counsel); (b) the property was taken by express or implicit authority (Defendants argue the taking was allegedly the result of an *ultra vires* act by Defendant Cremonte, which is not imputed to Defendant Livingston County); and (c) state remedies are unavailable (Defendants argue that this is especially true as a conversion action is an adequate remedy). *See, e.g., Lytle v. Potter*, 480 F.Supp.2d 986, 990 (N.D. Ohio 2006) (citing *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 475 (6th Cir. 2005).

37

Plaintiff counters that *Braun* is inapplicable in this case, as Defendants did not make any remedies available to Plaintiff or even tell Plaintiff of the takings, but Plaintiff does not cite any authority to support this argument. Plaintiff argues that Defendants do not explain how the publications taken and made available to the Jail inmates "could be anything other than a public use of materials." The property at issue is being made available only to a very select segment of the population, not clearly the public at large. For that reason, the Court grants Defendants' motion for summary judgment with respect to Count III.

## III.   PLAINTIFF'S MOTION TO STRIKE EXHIBITS

In its Motion to Strike Exhibits to Defendants' Motion for Summary Judgment, Plaintiff seeks to have the Court strike: (a) five exhibits, each of which is an entire deposition transcript; and (b) three reports that relate to staffing or budget matters at the Jail. The Court denies Plaintiff's Motion to Strike.

### A.   Deposition Transcripts

Eastern District of Michigan, Local Rule 26.2 provides, in part:

(a)   A party or other person may not file discovery material specified in Fed. R. Civ. P. 5(d)(1) and certificates of service for such discovery material except:

(1)   when it provides factual support for a Motion, response or reply. The party or other person relying on the material *must file only the germane portion of it as an exhibit or attachment to the Motion, response, or reply*.

38

(emphasis added). Plaintiff argues that, because Defendants attached entire deposition transcripts as Exhibits 1, 2, 3, 10, and 19 to their Motion for Summary Judgment, Defendant violated Local Rule 26.2 and the Court should strike all five exhibits.

The Court is not persuaded by Plaintiff's argument for several reasons: (1) Plaintiff made, and the Court declined to adopt, the same arguments regarding entire deposition transcripts included as exhibits to prior filings by Defendants in this case, *see* Dkt. No. 218 ("the attachment of the entire transcript of these depositions might aid the Court in its decision and, in its discretion, allows these exhibits"); (2) Plaintiff attached the entire deposition transcript of Defendant Bezotte in support of its Motion for Summary Judgment, even though Plaintiff only cited to four pages of that transcript, *see* Dkt. No. 262, PgID 7557, 7575, Dkt. No. 262-33, PgID 7883-7905; and (3) Plaintiff has not shown–and there is no reason for the Court to find–that Plaintiff is in any way prejudiced by the filing of entire transcripts as exhibits in this case. The Court denies Plaintiff's Motion to Strike as it relates to Exhibits 1, 2, 3, 10, and 19 to Defendants' Motion for Summary Judgment.

### B.    Staffing and Budgetary Reports

Plaintiff seeks to strike Exhibit 5, a 2002 County Jail Services Unit ("CJSU") report because Plaintiff claims it is too old to be relevant. Plaintiff seeks to strike Exhibit 8, a 2010 CJSU Inspection Report because it is a draft (not a final) report,

contains hearsay, and is untrustworthy.  Plaintiff seeks to strike Exhibit 9, a 2012 CJSU Inspection Report because it contains hearsay and is untrustworthy.

Defendants assert that the 2002 report provides a complete picture of the County's increasing budget constraints that led to the policy changes.  Defendants state that the 2010 report demonstrates the staffing inadequacies the Jail faced. Defendants assert that the draft version of the 2010 report is the proper document to demonstrate the staffing inadequacies because it reflects the CJSU's raw findings, without input and influence of the County.  Defendants rely on the 2012 report to demonstrate the staffing inadequacies it faced.

A district court has discretion whether to strike exhibits. *See, e.g., Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003).  The Court concludes that Plaintiff's request to strike the three reports is unwarranted.  First, there is no need for the Court to rely on Exhibit 5, 8, or 9 in deciding Defendants' Motion for Summary Judgment.  As the Court does not rely on the documents in deciding the dispositive motion, there is no need to strike the documents. *See, e.g., Fox v. Michigan State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006).  Second, Plaintiff cites no Sixth Circuit authority (only district court cases) for the proposition that a district court has the authority to strike inadmissible exhibits to dispositive motions.  As the *Fox* court noted, "the Federal Rules of Civil Procedure do not require the district court to remove

40

documents other than the pleadings from the record in a case." *Id.*

Third, "it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment," *Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001) (citation omitted), and evidence that is not relevant is inadmissible. Fed.R.Evid. 402.   But, just because evidence is not admissible does not dictate that the district court strike the evidence; it just means that the district court must not consider it.

Fourth, there are no specific references to the CJSU reports in the discussion and analysis sections of Defendants' Motion for Summary Judgment.  All references to Exhibits 5, 8, and 9 were on pages 5-6 of Defendants' brief (the Statement of Facts section), Dkt. No. 258, PgID 6583-84, and "CJSU," "2002," "2010," and "2012" are not used after pages 5-6 of Defendants' brief (other than in case citations).   As Defendants' arguments in favor of summary judgment are not, and the Court's decision need not be, based on any of those three reports, the Court will not strike Exhibits 5, 8, and 9 from the record.

Fifth, even if the Court were to rely on any of the CJSU reports, there appears to be admissible and relevant evidence in each of the reports.  The 2002 report may bear on Defendants' arguments regarding staffing issues in light of budgetary restraints, at least relative to why certain staffing and budgetary decisions allegedly

41

involved in this lawsuit were made.  Both the 2010 and 2012 reports are public

records and, even if some of the evidence in those reports constitutes inadmissible

hearsay, there is still admissible evidence in both reports.  Plaintiff's complaints about

those reports appear to be more about reliability than admissibility, which is an issue

for cross-examination.  Finally, Defendants's arguments in their brief, regarding

staffing and budgetary issues, do not identify or specify Exhibits 5, 8, and 9; the

discussions are about staffing and budgetary issues generally.    For these reasons, the

Court denies Plaintiff's Motion to Strike as it relates to Exhibits 5, 8, and 9.

## IV.    CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [Dkt. No.

258] is **DENIED IN PART and GRANTED IN PART**;

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment

[Dkt. No. 261] is **DENIED**; and

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Exhibits to

Defendants' Motion for Summary Judgment [Dkt. No. 274] is **DENIED**.

IT IS SO ORDERED.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

42

Dated:  March 31, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2017, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager